24CA1036 Peo in Interest of WW 05-22-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1036
Weld County District Court No. 21JV63
Honorable W. Troy Hause, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of W.W. and C.W., Children,

and Concerning J.W.,

Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE SCHOCK
Dunn and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 22, 2025

---

William Ressue, County Attorney, Nicole Liley, Assistant County Attorney, Fort Collins, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Fourth Street Law, LLC, Christopher J. Linas, Castle Rock, Colorado, for Appellant

¶ 1    In this dependency and neglect proceeding, J.W. (father) appeals the judgment terminating his parent-child legal relationships with W.W. and C.W. (the children).  We affirm.

## I.    Background

¶ 2    The Larimer County Department of Human Services filed a petition in dependency and neglect regarding then-seven-year-old W.W. and then-six-year-old C.W. based on concerns that father had sexually abused C.W. and physically abused both children.

¶ 3    Father stipulated to a "no-fault" adjudication of dependency and neglect under section 19-3-102(1)(e), C.R.S. 2024.  He also stipulated that the proposed treatment plan was "appropriate and in the best interest of the [c]hildren."  The juvenile court accepted the stipulation, adjudicated the children dependent and neglected, and approved and adopted the stipulated treatment plan.

¶ 4    The treatment plan provided for two phases.  The first phase included as an objective that father "complete [a] psychological evaluation with [a] sexual focus."  This objective elaborated:

> [Father] will complete a psychological
> evaluation with a sexual abuse focus because
> of reports concerning inappropriate sexual
> contact between [father] and [C.W.].  The
> Department has made administrative findings

1

> regarding the alleged sexual abuse and [father] denies these allegations. The evaluator completing the psychological evaluation will not presume that [father] committed the alleged acts nor is there an expectation that [father] make any admission during the evaluation. The purpose of this evaluation is to determine if there are any behaviors which need to be addressed to safely reunify the children.

The treatment plan required the parties to attempt to agree on an evaluator to conduct the psychological evaluation, but provided that, if they could not agree, the court would select one.

¶ 5 The first phase of the treatment plan also required father to (1) stay in communication with the Department; (2) attend therapeutic family time with W.W.; and (3) complete a trauma-informed parenting class and apply those techniques with the children. Once the Department received the recommendations of the evaluations required by the first phase of the treatment plan, it was to propose an updated treatment plan as the second phase.

¶ 6 The parties could not agree on a psychological evaluator, so the court ordered each party to propose up to three evaluators and provide each evaluator's qualifications, availability, and an affidavit indicating their understanding of the scope of the evaluation.

¶ 7     The Department proposed Dr. Jessica Bartels,[1] and the children's guardians ad litem (GALs) agreed.  In an attached letter, Dr. Bartels confirmed that she could conduct a psychological evaluation with a sexual focus, as she had done many times before, and explained that the assessments used for such an evaluation are case-dependent.  Father did not propose any evaluators.  Instead, he filed a completed evaluation performed by Dr. Lon Kopit, who had not been agreed on by the parties or approved by the court.

¶ 8     The juvenile court appointed Dr. Bartels to complete the psychological evaluation.  The court noted that father failed to submit any proposed evaluator for the court's consideration but instead chose his own evaluator.  The court ruled that Dr. Bartels's evaluation could consist of either a peer review of Dr. Kopit's report or her own evaluation and that father "needs to cooperate with that."  Father's counsel said the court's order was "incredibly reasonable" and that father would "absolutely comply" with it.

---

[1] The Department's notice and the juvenile court's order spell Dr. Bartels's name "Bartles."  But we use the spelling used in Dr. Bartels's own letter and curriculum vitae attached to the notice.

¶ 9    Two months later, father moved the court to reconsider its order directing him to submit to psychological testing.  Relying on *People in Interest of M.W.*, 2022 COA 72, ¶ 4, which had been issued in the interim, he argued that he could not be required to complete a Sex Offender Management Board (SOMB) psychosexual evaluation because he had not been convicted of a sex offense.  Father further asserted that, as an SOMB provider, Dr. Bartels intended to use "at least one psychosexual inventory as part of her evaluation."  He therefore asked the court to reconsider Dr. Bartels's appointment or, "at a minimum," to clarify the scope of the evaluation.

¶ 10    The juvenile court denied father's motion.  It noted that father had stipulated to the treatment plan requiring him to undergo a psychological evaluation with a sex abuse focus and that the plan prohibited the evaluator from presuming father's guilt or seeking an admission.  The court further concluded that the treatment plan did not violate *M.W.* because it did not require father to submit to an SOMB evaluation.  The court ordered father to commence the evaluation with Dr. Bartels within seven days.

¶ 11    Father refused to do so.  Instead, he completed a second evaluation with Dr. Shawn Wygant, who also had not been agreed to by the parties or approved by the court.

¶ 12    The Department and the GALs moved to terminate father's parental rights as to both children.  The court held a multi-day hearing over the course of seven months and granted the motion.  In doing so, the court explained that father had failed to complete a psychological evaluation in compliance with the treatment plan.  It also found that the treatment plan had not been successful because father had "not progressed out of phase 1 in over three years" and "exhibits the same problems . . . without adequate improvement."

## II.    Statutory Criteria and Standard of Review

¶ 13    A juvenile court may terminate a parent-child legal relationship if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan, or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time.  § 19-3-604(1)(c), C.R.S. 2024.

¶ 14    Whether a juvenile court properly terminated parental rights is a mixed question of law and fact because it involves the application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. The proper legal standard to be applied and the application of that standard to the particular facts of the case are questions of law that we review de novo. *M.A.W. v. People in Interest of A.L.W.*, 2020 CO 11, ¶ 31. But we will not disturb the juvenile court's factual findings unless they are "so clearly erroneous as to find no support in the record." *A.M.*, ¶ 15 (citation omitted). The credibility of the witnesses, the weight of the evidence, and the inferences and conclusions to be drawn from the evidence all lie within the juvenile court's discretion. *Id.*

### III.    Appropriate Treatment Plan

¶ 15    Father argues that his treatment plan was not appropriate as implemented. He does not challenge the treatment plan itself, and indeed, he concedes that the plan was appropriate as written. But he asserts that Dr. Bartels was an inappropriate evaluator because she was SOMB-certified and intended to use a "LOOK Assessment," which he asserts is used in SOMB evaluations. Even assuming that

father could challenge the implementation of a treatment plan in accordance with terms to which he stipulated, we discern no error.

### A. Applicable Law

¶ 16    A treatment plan is appropriate if it is "reasonably calculated to render the [parent] fit to provide adequate parenting to the child within a reasonable time and that relates to the child's needs." § 19-1-103(12), C.R.S. 2024. The plan should be designed "to preserve the parent-child relationship by assisting the parent in overcoming the problems that required the intervention." *K.D. v. People,* 139 P.3d 695, 699 (Colo. 2006) (citation omitted). But the appropriateness of a treatment plan "must be assessed in light of the facts existing at the time of the plan's approval." *People in Interest of B.C.,* 122 P.3d 1067, 1071 (Colo. App. 2005). A treatment plan is not inappropriate just because it is unsuccessful. *People in Interest of D.P.,* 160 P.3d 351, 354 (Colo. App. 2007).

¶ 17    It is appropriate for a treatment plan to address material barriers to reunification of the child and the parent, "even if the order of adjudication was not necessarily predicated upon the particular problem the treatment plan seeks to address." *M.W.,* ¶ 43; *see also People in Interest of C.L.S.,* 934 P.2d 851, 856 (Colo.

7

App. 1996) ("[T]he specific ground on which the [court finds] the child to be dependent and neglected [does] not restrict the juvenile court's discretion to formulate a treatment plan in the best interests of the child."). But the court may not order a parent to comply with a treatment plan component that is not warranted by the record before the court. *People in Interest of L.M.*, 2018 COA 57M, ¶ 51.

## B. SOMB Standards in Treatment Plans

¶ 18 The SOMB is responsible for developing and implementing guidelines and standards to evaluate and treat adult sex offenders. § 16-11.7-103(4)(a), (b), C.R.S. 2024; *see also L.M.*, ¶ 41; *M.W.*, ¶ 33. The SOMB protocols "are geared toward treating individuals who have been convicted of a sexual offense." *L.M.*, ¶ 43; *see also M.W.*, ¶ 34 (noting that "sex offender," as used in the SOMB statutes, means defendants who have been convicted of one or more of the offenses listed in section 18-1.3-1003(5), C.R.S. 2024).

¶ 19 Because the SOMB Standards are designed to be used with sex offenders, a parent who has not been convicted of a qualifying sexual offense "may not be required, over their objection, to complete an SOMB psychosexual evaluation or SOMB therapy as a condition of their treatment plan." *M.W.*, ¶ 56. Nor may a parent

8

be required to admit sexual abuse as part of a treatment plan when the parent has not either been convicted for such abuse or found to have committed it by clear and convincing evidence. *L.M.*, ¶ 52.

¶ 20    But that does not mean a parent may not be required to "participate in an evaluation and obtain treatment or counseling for sexual behavior that poses a risk to the parent's children." *M.W.*, ¶ 59. An appropriate treatment plan may include "psychological counseling focused on the problematic behavior of a parent." *Id.* And in cases involving allegations of sexual abuse, such treatment can include "evaluation of a parent's sexual proclivities" so long as it does not require compliance with "an SOMB evaluation or treatment pursuant to the SOMB Standards." *Id.*

## C.    Analysis

¶ 21    Father's treatment plan did not require him to submit to an SOMB psychosexual evaluation or treatment under the SOMB Standards. Nor did it require him to admit the alleged sexual abuse. To the contrary, the treatment plan expressly provided that the psychological evaluator must *not* presume that father committed the alleged abuse, "nor is there an expectation that

[father] make any admission during the evaluation." The treatment plan therefore did not run afoul of either *M.W.* or *L.M.*

¶ 22 Father nevertheless contends that Dr. Bartels's intended use of the LOOK Assessment was inappropriate because it is used in SOMB evaluations and, like other SOMB tools, is designed for "individuals who have committed a sex crime." As an initial matter, the record contains no evidence of the nature of the LOOK Assessment. Father's counsel read a sentence from the LOOK Assessment's website — including that it is used by clinicians to evaluate and treat those who have committed a sex crime — during her cross-examination of a caseworker. But the juvenile court sustained an objection to a question about this description as outside the scope of the caseworker's expertise. And in any event, the court found the website unhelpful. *See People in Interest of K.L.W.*, 2021 COA 56, ¶ 62 ("[I]t is not our role to reweigh the evidence or substitute our judgment for that of the juvenile court.").

¶ 23 But even accepting father's characterization of the LOOK Assessment, nothing precludes a psychological evaluator from using tools that are also used in SOMB evaluations — so long as the evaluation does not require the evaluator to assume, or the

parent to admit, that the abuse occurred. *See M.W.*, ¶¶ 59-60. And the record does not support father's assertion that the proposed LOOK Assessment was premised on an assumption of guilt.

¶ 24    The caseworkers assigned to the case testified that they made clear to Dr. Bartels that her evaluation could not presume father's guilt. They also testified that it was their understanding from Dr. Bartels that the LOOK Assessment would not presume guilt. When father objected to the LOOK Assessment on the ground that it was used in SOMB evaluations and would presume guilt, the caseworkers attempted to clarify this point with Dr. Bartels. But by then, father had revoked his release of information, and Dr. Bartels declined to provide the Department any further information about father's evaluation, including whether she intended to give father the LOOK Assessment at all. Thus, the sole evidence in the record is that the LOOK Assessment was *not* a "guilt-based assessment."

¶ 25    Father attempts to shift responsibility for the lack of evidence concerning the LOOK Assessment to the Department by arguing that the Department bears the burden of proving the appropriateness of the treatment plan by clear and convincing evidence. *See* § 19-3-604(1)(c)(I). But father admits that the

11

treatment plan was appropriate. And there is no dispute that the juvenile court's appointment of Dr. Bartels complied with the treatment plan. There is nothing in the record to suggest that this concededly appropriate treatment plan was made inappropriate by the possible use of an assessment that the plan did not require.

¶ 26     Thus, because the treatment plan did not require father to participate in an SOMB evaluation or therapy, or admit the allegations of sexual abuse, the juvenile court did not reversibly err by finding that the stipulated treatment plan was appropriate.

## IV.   Fitness

¶ 27     Father next argues that the juvenile court erred by finding him unfit because it (1) failed to consider all thirteen bases for unfitness set forth in section 19-3-604(2) and (2) did not identify the "conduct or condition" that made him unfit. We again discern no error.

### A.    Applicable Law

¶ 28     A parent is unfit if their conduct or condition renders them unable or unwilling to give a child reasonable parental care. *D.P.*, 160 P.3d at 353. Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental needs and

conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006). A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs" and may be considered in determining unfitness. *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 29 The findings supporting a termination judgment are adequate if they conform to the criteria in section 19-3-604. *People in Interest of A.G.-G.*, 899 P.2d 319, 323 (Colo. App. 1995). The findings must "adequately address and resolve each specific requirement for termination." *People in Interest of M.C.C.*, 641 P.2d 306, 308 (Colo. App. 1982). We will set aside a judgment for inadequate findings only when the findings do not conform to the statutory criteria and do not allow us to determine the basis for the court's judgment. *See People in Interest of J.M.B.*, 60 P.3d 790, 794 (Colo. App. 2002).

¶ 30 In reviewing the juvenile court's findings, we are not limited to the facts and evidence specifically mentioned in the juvenile court's written order. *See id.* Instead, our task is to ensure that the record, reviewed in its entirety, supports the court's findings. *People in Interest of M.S.H.*, 656 P.2d 1294, 1297 (Colo. 1983).

¶ 31    We agree with father that the juvenile court's unfitness findings could have been more detailed.  But the court found that reasonable efforts by the Department had been unable to rehabilitate father.  *See* § 19-3-604(2)(h).  It also found that father (1) exhibits the same problems addressed in his treatment plan without adequate improvement; (2) is unable or unwilling to give the children reasonable parental care; and (3) "feels that he has been persecuted [and] lays blame on [m]other and the Department . . . without taking affirmative actions necessary and within his control to address the issues in his treatment plan."  These findings allow us to determine the basis for the juvenile court's unfitness finding.

¶ 32    Moreover, the record provides ample support for that finding.  For example, caseworkers testified that father consistently failed to understand the Department's concerns, instead blaming all the children's issues on mother.  Although father completed a trauma-informed parenting class about a year after the treatment plan was adopted, he was unable to describe the concepts and skills he learned in that class, and what little information he did provide again sought to shift blame to mother's parenting skills.

14

¶ 33    One caseworker also testified about her concerns with father's lack of progress during therapeutic family time. The Department never received any goals for the therapeutic parenting time, and the supervisor never recommended a reduction in the level of supervision. And W.W. felt less safe with father as therapeutic family time went on. Eventually, father's therapeutic family time was stopped more than a year before the final day of the termination hearing because of concerns about W.W.'s mental health. At that point, W.W. did not want to see father and was experiencing anxiety, bathroom accidents, and emotional outbursts before and after family time. According to father's therapeutic supervisor, father and W.W. "were not in a great place."

¶ 34    There was also evidence that father failed to take responsibility for his physical discipline of W.W., minimizing its seriousness. In one instance in which father had grabbed W.W.'s ear, father told W.W. that his ear only hurt because he had tried to pull away.

¶ 35    The psychologist who performed a parent-child interactional assessment of father and W.W. also testified to concerns about father's parenting. He testified that father was unable to acknowledge any responsibility for W.W.'s situation and presented

instead as a "targeted parent who was a victim of alienation by mother." But even if some of the problems were caused by mother's alienation or coaching, father still needed to be an "active, empathetic, responsive, and responsible parent."

¶ 36 The psychologist observed that father and W.W. were "great playmates," but that father could not set limits and did not try to "understand things from [W.W.'s] perspective." He explained that some of father's behaviors, such as allowing certain privileges that he knew were restricted at mother's house, put W.W. in a difficult position. And it was "difficult for [father] to set aside his concerns about [mother] and focus just on [W.W.] when they [were] together."

¶ 37 Father's therapeutic family time supervisor described several concerns as well. She testified to similar concerns about father allowing W.W. to do things that were not permitted at mother's house. She also expressed concern about father's manipulative statements to W.W., including telling W.W. that he would not shave his beard until he could see C.W. and that he had Christmas presents for the children that he was not allowed to give them. The supervisor further explained that she had concerns about father "interrogating" W.W. and had to coach him not to do so.

¶ 38     As to C.W., father was encouraged to write her letters as she attended therapy to prepare for reunification with father.  But although there was no limit on the letters father could write C.W., he wrote only two.  Father told the caseworkers that he did not send any more letters to C.W. because he believed that mother was influencing her.  Instead, he opted to write letters and hold on to them until C.W. was an adult and free from mother's influence.  As a result, father made no progress toward reunification with C.W.

¶ 39     Relying on the therapeutic supervisor's testimony, which father says "leaned positive overall," father insists that his parenting skills did improve over the life of the case.  He points out that the supervisor "noted progress in several areas[] and recommended against termination."  But the question is not whether father had made progress; it is whether father was willing and able to meet the children's needs.  *See A.J.*, 143 P.3d at 1152.  And by highlighting this contrary evidence, father does no more than ask us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do.  *K.L.W.*, ¶ 62.

¶ 40     Father takes issue with the juvenile court's apparent exclusive reliance on section 19-3-604(2)(h) — that reasonable efforts have

been unable to rehabilitate the parent — to find him unfit. He argues that this factor is only one of thirteen that the court must consider. *See* § 19-3-604(2). But although the juvenile court "shall consider" the enumerated factors, *id.*, it need not address factors that are not pertinent to the case before it. *See People in Interest of I.J.O.*, 2019 COA 151, ¶ 23 (requiring juvenile court to make explicit findings regarding any factor in section 19-3-604(2) it considers to be relevant); *cf. People in Interest of A.M.K.*, 68 P.3d 563, 565-66 (Colo. App. 2003) (noting that district court need not make findings on each and every statutory best interests factor, provided the court considered the "pertinent factors"). And a parent's lack of rehabilitation despite reasonable efforts is alone sufficient to render the parent unfit, regardless of the presence of any other factor. *See D.P.*, 160 P.3d at 353-54. Father does not point to any other factor in section 19-3-604(2) that he contends is pertinent to his case.

¶ 41    Father also contends that the court could not find him unfit without identifying the specific "conduct or condition" that made him so. But the statute does not require the juvenile court to name the parent's conduct or condition. As detailed above, the evidence of father's failure to provide reasonable parental care was not

18

confined to the disputed sexual abuse allegations. The treatment plan also required father to make progress toward rebuilding his relationship with W.W. and apply trauma-informed parenting techniques to promote the children's wellbeing. The court found that father had failed to take the necessary actions to address these issues. That conduct — or lack of conduct — was sufficient to render father unfit, wholly apart from the sexual abuse allegations.

¶ 42 For the same reasons, we reject father's premise that the juvenile court's unfitness finding was based solely on his noncompliance with the psychological evaluation component of his treatment plan. Father is correct that section 19-3-604(1)(c) requires the court to find *both* that a parent did not comply with an appropriate treatment plan *and* that the parent is unfit. But the juvenile court did so, and the record supports both findings.

¶ 43 In sum, the juvenile court's unfitness finding conforms to the statutory criteria, is amply supported by the record, and allows us to determine the basis for the court's order of termination. *See J.M.B.*, 60 P.3d at 794. We therefore will not set aside that finding.

## V.    Less Drastic Alternatives

¶ 44    Father also contends that the juvenile court erred by finding there was no less drastic alternative to termination of his parental rights, namely (1) an allocation of parental responsibilities (APR) to mother; (2) a modified treatment plan that did not require father to take the LOOK Assessment; or (3) the termination of father's parental rights only as to C.W. and not as to W.W.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 45    Before terminating parental rights, the juvenile court must consider and eliminate less drastic alternatives.  *A.M.*, ¶ 19.  In doing so, the court must "give primary consideration to the child's physical, mental, and emotional needs."  *Id.* at ¶ 20.  The court may consider, among other things, whether an ongoing relationship with the parent would be beneficial or detrimental to the child and whether an APR would provide the child with adequate permanence and stability.  *People in Interest of A.R.*, 2012 COA 195M, ¶¶ 38, 41; *People in Interest of T.E.M.*, 124 P.3d 905, 910-11 (Colo App. 2005).

¶ 46    A less drastic alternative is not viable simply because it is "adequate."  *A.M.*, ¶ 27.  It must be in the child's best interests.  *Id.* Thus, if the juvenile court considers less drastic alternatives but

finds instead that termination is in the child's best interests, it must reject the alternatives and order termination. *Id.* at ¶ 32. And we must affirm that decision if the court's findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Analysis

¶ 47 The juvenile court considered less drastic alternatives, including an APR, but determined that nothing short of termination would adequately meet the children's needs. It found that the children needed permanency and that an APR would "perpetuate what has been occurring the last three years." The court also found that, given father's lack of progress on his treatment plan, it was "highly unlikely" that he would make the necessary progress "in a time frame that is in the best interest of the minor children."

¶ 48 The record supports the juvenile court's findings. One of the caseworkers specifically opined that an APR to mother would not be an appropriate alternative because the children needed permanency that could not be achieved as long as the court and the Department were involved. She explained that the ongoing Department involvement was traumatic to the children and was negatively affecting their relationship with one another. The caseworker also

21

testified that terminating father's parental rights as to C.W. but not as to W.W. would further harm the children's relationship. She concluded that terminating father's parent-child legal relationship with both children would be in the children's best interests.

¶ 49 Moreover, the less drastic alternative inquiry is intertwined with father's fitness to care for the children. *L.M.*, ¶¶ 5, 27. And father had not seen C.W. in three years or W.W. in more than a year. As discussed above, he made little attempt to maintain a bond with C.W. by writing her letters, and he did not sufficiently develop his parenting skills to resume family time with either child. Even apart from the sexual abuse allegations, father was unable to acknowledge any responsibility for the children's situation or set aside his concerns about mother when he was with W.W.

¶ 50 Father asserts that the children's need for permanency was not a sufficient basis in and of itself to terminate his parental rights. But the juvenile court did not terminate father's parental rights based on the children's need for permanency alone. Instead, it first found that all the statutory criteria for termination, including father's unfitness, had been established by clear and convincing evidence. It then considered the children's need for permanency as

one factor supporting its finding that an APR was not a viable alternative. That is a proper consideration. *See A.R.*, ¶ 41 ("[L]ong-term or permanent placement . . . may not be a viable less drastic alternative if it does not provide adequate permanence . . . .").

¶ 51 Father maintains that the court could have achieved the same degree of permanence through an APR to mother that father could not seek to modify until he had completed a psychological evaluation and treatment. But the caseworker testified that the prospect of ongoing court or Department involvement was "not permanency" and was itself "traumatic" for the children. The juvenile court agreed, finding that an APR would "only perpetuate what has been occurring for the last three (3) years." Because the record supports that finding, we may not disturb it. *See B.H.*, ¶ 80.

¶ 52 As for father's argument that the court should have adopted new treatment recommendations that did not require him to participate in the LOOK Assessment, this is simply a reframing of his argument that the treatment plan was inappropriate as implemented. A less drastic alternative is a permanent or long-term placement arrangement that would *conclude* the dependency and neglect proceeding without terminating parental rights. The

adoption of new treatment recommendations would simply prolong the proceeding. In any event, because the treatment plan was appropriate, the juvenile court had no obligation to modify it.

¶ 53 Finally, because the juvenile court found, with record support, that the statutory criteria for termination were satisfied with respect to both children, and that there was no less drastic alternative to termination for either child, there was no basis for the court to terminate father's parental rights as to one child and not the other.

¶ 54 We therefore conclude that the juvenile court's finding that there was no less drastic alternative to termination is supported by the record, and we will not disturb it on appeal. *See id.*

## VI. Disposition

¶ 55 The judgment is affirmed.

JUDGE DUNN and JUDGE BROWN concur.

24