25CA2163 Peo in Interest of AK 06-04-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA2163
Arapahoe County District Court No. 22JV266
Honorable Shay Whitaker, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of Ad.K. and Ar.K., Children,

and Concerning E.R.,

Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE HARRIS
Tow and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 4, 2026

---

John Christofferson, Interim County Attorney, Alison A. Bettenberg, Assistant County Attorney, Aurora, Colorado, for Appellee

Debra W. Dodd, Guardian Ad Litem

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant

¶ 1 In this dependency and neglect action, E.R. (mother) appeals the judgment terminating her parent-child legal relationships with Ad.K. and Ar.K. (the children).[1] She contends that the juvenile court erred by determining that (1) she was not fit and could not become fit within a reasonable time and (2) there was no less drastic alternative to termination. We disagree and affirm.

## I. Background

¶ 2 In May 2022, police arrested both parents following a domestic violence incident during which sixteen-month-old Ad.K. and four-month-old Ar.K. were present. The Arapahoe County Department of Human Services (the Department) filed a petition in dependency and neglect, alleging a history of domestic violence by the children's father against mother. The children were placed with family friends.

¶ 3 The juvenile court adjudicated the children dependent and neglected and adopted a treatment plan for mother. The treatment plan required mother to, among other things, participate in

---

[1] During the pendency of the case, mother gave birth to two other children (the younger siblings). The younger siblings are not part of these proceedings.

1

domestic violence treatment and develop protective parenting capacity to provide a safe and stable environment for the children.

¶ 4     Over the next two years, mother complied with most components of her treatment plan: she maintained housing and employment; she worked cooperatively with the Department; she underwent a mental health evaluation and engaged in therapy, including domestic violence treatment; and she consistently attended visits with the children.  She also obtained a protection order prohibiting father from contacting her.

¶ 5     But the Department had concerns about mother's continued contact with father.  In 2023, after she gave birth to her third child, mother moved to new housing provided through a domestic violence program.  The program's rules prohibited mother from giving father her address.  In July 2023, father appeared at the home and threatened mother and a neighbor.  Then in December 2023, father came to the home drunk; mother let him in, and he beat her, breaking her nose and back.  Father was arrested and incarcerated for several months.

¶ 6     In July 2024, while father was incarcerated, the children were returned to mother's care, and that fall, the parties agreed to an

allocation of parental responsibilities (APR). But before the APR entered, father bonded out of jail, and the Department received multiple reports that father had "been around the home where the children [were] living." According to one report, father went to mother's home in September 2024 and assaulted her, and the police were called. Although mother denied any contact with father, the court decided to continue its jurisdiction to allow the Department to investigate the reports.

¶ 7 In January 2025, father was stopped by police while driving in tandem with mother, who was driving a U-Haul truck. Father was under the influence of alcohol, and the younger siblings were in the car, unrestrained. The juvenile court again removed the children from mother's care and placed them with the same kin provider.

¶ 8 The Department moved to terminate mother's parental rights shortly after the second removal. Three years after the petition was filed, the court held a hearing on the motion. By that time, father had been sentenced to sixteen years in prison in connection with the December 2023 assault against mother. After hearing evidence over three days, the juvenile court terminated mother's parental rights.

## II.  Discussion

¶ 9     Mother contends that the juvenile court erred by determining that (1) she was not fit and could not become fit within a reasonable time and (2) there were no less drastic alternatives to termination.

### A.  Termination Criteria and Standard of Review

¶ 10     A juvenile court may terminate the parent-children relationships if it finds, by clear and convincing evidence, that (1) the children were adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan, or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time.  § 19-3-604(1)(c), C.R.S. 2025.

¶ 11     Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support."  *People in Interest of S.R.N.J-S.*, 2020 COA 12,

4

¶ 10. But we review de novo the juvenile court's legal conclusions based on those facts, including whether a parent is fit. *Id.* at ¶ 11; *People in Interest of A.J.L.*, 243 P.3d 244, 246 (Colo. 2010) (fitness is a legal conclusion).

¶ 12 A requirement that the juvenile court consider and eliminate less drastic alternatives is implicit in the statutory criteria for termination. *A.M.*, ¶ 19. Whether there is a less drastic alternative to termination that serves the children's best interests is a fact question reviewed for clear error. *People in Interest of H.L.B.*, 2025 COA 86, ¶ 10.

## B. Mother's Fitness

¶ 13 Mother contends that because father's incarceration neutralized the Department's only child protection concern, and she otherwise complied with her treatment plan, the court erred by concluding that she was unfit and unlikely to become fit within a reasonable time.

¶ 14 A parent is unfit if her conduct or condition renders her unable or unwilling to provide the children with reasonable parental care. § 19-3-604(2); *People in Interest of S.K.*, 2019 COA 36, ¶ 74. Reasonable parental care requires, at a minimum, that the parent

provide nurturing and safe parenting adequate to meet the children's physical, emotional, and mental health needs and conditions. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 23.

¶ 15 We acknowledge, as the juvenile court did, that mother generally complied with her treatment plan. But the court found that the plan was not successful in rendering mother a fit parent because she failed to internalize the lessons from her domestic violence treatment and to develop the protective capacity necessary to keep the children safe from the risk of emotional and physical harm caused by exposure to domestic violence. *See K.D. v. People*, 139 P.3d 695, 699 (Colo. 2006) ("[E]ven a parent's substantial compliance with a [treatment] plan may not render the parent fit.").

¶ 16 Those findings are supported by the record. The caseworker testified that mother was unfit because she lacked an understanding of how the presence of an abusive partner affected the children. According to the caseworker, mother did not have the protective capacity required to keep the children safe: she was reluctant to obtain a protection order against father; even after the order issued, she maintained contact with him; she allowed father to see the children in violation of the juvenile court's orders; and

she lied to the Department about her relationship with father. The caseworker noted that although it seemed at times that the Department had "buy in" from mother, it turned out that her commitment to severing ties with father was illusory.

¶ 17 There was also ample evidence that exposure to domestic violence is harmful to children. The caseworker testified that domestic violence causes trauma and developmental delays and affects a child's ability to develop healthy relationships. The family time coach said that children who witness domestic violence often resort to violence to solve conflicts. (The caseworker testified that the children acted much more aggressively after they were returned to mother's care in 2024.) We recognize that father was the cause of the violence and that he victimized mother as well as the children. But at the same time, the court could not ignore mother's failure to keep the children safe. *See People in Interest of A.N-B.*, 2019 COA 46, ¶ 30 (concluding that a parent who did not recognize the danger that the other parent posed to the children had not resolved protective concerns addressed in the treatment plan); *People in Interest of C.T.S.*, 140 P.3d 332, 334 (Colo. App. 2006) ("[W]here a parent chooses to remain in a relationship with a person

who poses a threat to the welfare of the child[ren]," the parent is not providing protection adequate to meet the children's needs and "may be found unfit.").

¶ 18    Mother argues that termination was not necessary to protect the children once father was sentenced to a lengthy prison term. But neither the caseworker nor the family time coach were persuaded that father's absence alleviated the child protection concerns. Both witnesses testified that domestic violence victims often repeat patterns of abuse with multiple partners. The caseworker said that because mother did not appear to understand the children's need to have "safe people around them," she might expose the children to other abusive intimate partners. And the caseworker pointed out that father anticipated being released from custody in eight years, at which time the children would still be preadolescents in need of protection.

¶ 19    Finally, we disagree that the court erred by determining that mother could not become fit within a reasonable time.

¶ 20    In determining whether the conduct or condition that renders a parent unfit will change within a reasonable time, the court may consider whether any change has occurred during the proceeding,

the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of K.B.*, 2016 COA 21, ¶ 31.

¶ 21    The children were initially removed from mother's care as infants three years before the termination hearing and had been living with the kin provider for most of their lives. The caseworker opined that it would take an additional six months to a year of intensive therapy for mother to become fit and that the delay would have "a negative impact on [the children]." And the evidence underscored that mother's trauma and victimization was a chronic condition that did not improve much during the pendency of the case.

¶ 22    To the extent mother contends that because the younger siblings are the subject of a separate dependency and neglect proceeding, and she is continuing to receive services in that case, the court should have given her more time to try to become fit in this case, we reject that contention. The court considered the effect of the other case but ultimately concluded that delaying permanency for the children at issue in this proceeding was not in their best interests. We are not in a position to second guess that

finding. A reasonable time is determined according to the unique needs of each child. *People in Interest of D.L.C.*, 70 P.3d 584, 588 (Colo. App. 2003) ("A parent may be unfit as to one, but not all, of his or her children.").

¶ 23     In sum, we perceive no error in the court's factual findings or legal conclusions that mother was unfit and unlikely to become fit within a reasonable time.

## C.     Less Drastic Alternative

¶ 24     Mother also argues that the juvenile court erred by finding that there was no less drastic alternative to termination. She says that the court could have granted an APR to one of her friends.

¶ 25     The inquiry concerning whether a less drastic alternative to termination exists must be guided by the children's best interests; the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3). To be a viable alternative to termination, the alternative must be in the "best interests" of the children and not merely "adequate." *A.M.*, ¶¶ 27, 37-38.

¶ 26     The juvenile court considered less drastic alternatives to termination but found that no alternative would meet the children's

needs and that termination of mother's parental rights was in their best interests.

¶ 27    The court's finding is not clearly erroneous. The caseworker testified that even if there was a placement provider willing to agree to an APR, that arrangement would not be appropriate for the children. Instead, the caseworker opined that termination was in the children's best interests because it would allow them to have a "normal childhood" with a permanent caregiver who would keep them safe. The caseworker endorsed the kin provider's view that termination would prevent a "back and forth in the court system" and help the children "have some emotional healing from everything that[] happened."

¶ 28    The caseworker also explained that moving the children to a new placement would be disruptive and detrimental. Mother's friend did not have the same relationship with the children as the kin provider: she met the children in July 2024, when they were returned to mother's care, and, after the second removal, she had contact with the children for a few hours a week during mother's visits. Moreover, the friend testified that she had no concerns

11

about mother's protective capacity and that, if it were up to her, the children would be returned to mother's care.

¶ 29    On this record, we discern no basis for disturbing the court's finding that there were no less drastic alternatives to termination.

¶ 30    Still, mother contends that the court should have given greater weight to the friend's willingness to be a placement for the children as well as the younger siblings, thereby maintaining the sibling bond. But the caseworker testified that all four children should not be placed together, except in a therapeutic home.

¶ 31    Mother also says that in opting for termination rather than an APR, the court disregarded expert testimony that disparate permanency outcomes — i.e., termination of mother's parental rights to the children but not the younger siblings — could cause enduring emotional distress for the children. The court was not required to accept the expert's testimony, however, even if it was uncontroverted. *In re Estate of Owens*, 2017 COA 53, ¶ 22. And mother's expert had never met mother or the children, so the court could reasonably have decided to give greater weight to the caseworker's testimony that termination was in the children's best interests. *See id.* (the trial court determines the "weight to accord

testimony," and the appellate court may not substitute its judgment for that of the trial court).

## III. Disposition

¶ 32    The judgment is affirmed.

JUDGE TOW and JUDGE BROWN concur.