25CA0250 Peo in Interest of CC 09-11-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0250
City and County of Denver Juvenile Court No. 23JV30734
Honorable Elizabeth J. McCarthy, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of C.C., a Child,

and Concerning C.F.C.,

Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE HARRIS
Fox and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 11, 2025

---

Michiko Ando Brown, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant

¶ 1     In this dependency and neglect case, C.F.C. (father) appeals the judgment terminating his parent-child legal relationship with C.C. (the child).  We reverse.

## I.     Background

¶ 2     In September 2023, after receiving a report that the child was born drug-exposed, the Denver County Department of Human Services (the Department) filed a petition in dependency or neglect.  The juvenile court granted temporary legal custody of the child to the Department and the child was placed with his maternal cousin, where he remained throughout the case.

¶ 3     When the child was born, father was living and working in Florida.  Aside from noting that he lived out of state, none of the petition's allegations related to father.

¶ 4     Father was notified of the proceedings and, in December 2023, genetic testing confirmed his paternity.  The juvenile court adjudicated the child dependent and neglected and adopted a treatment plan for father.  The treatment plan required father to (1) consistently spend time with the child to build a relationship and learn the child's needs; (2) obtain and maintain a verifiable source

1

of income and a suitable home; and (3) cooperate with the Department.

¶ 5    Father returned to Colorado in May 2024.  Less than four months later, the Department asked the court to set a termination hearing[1] and later filed a motion to terminate father's parental rights.  The court granted the motion after a hearing.

## II.    Statutory Criteria

¶ 6    The goal of a dependency and neglect case is to preserve the parent-child relationship whenever possible.  *People in Interest of C.A.K.*, 652 P.2d 603, 610 (Colo. 1982).  And given that the termination of a parent-child legal relationship affects a parent's fundamental liberty interest in the care and custody of the child,

---

[1] The Department's request to set a termination hearing occurred at a status hearing in August 2024.  In a report prepared for that August hearing, the caseworker stated that

> [father] has been attending in person visits with [the child] consistently and has been fully engaged.  He brings diapers and food as well as toys.  [Father] and [the child] seem to enjoy a good relationship and are comfortable with each other. . . .  [Father] currently has visits twice a week for 2 hours and he has consistently attended these visits.  The family time supervisor reports he does very well during visits.

the state must exercise extreme caution in terminating parental rights. *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006). For this reason, a juvenile court must strictly comply with the statutory termination criteria. *Id.*; *People in Interest of L.M.*, 2018 COA 57M, ¶ 18.

¶ 7 A juvenile court may terminate a parent-child legal relationship if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan, or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025. "The burden of proof lies with the party seeking termination." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 8.

### III. Analysis

¶ 8 Father argues that the juvenile court erred by finding him unfit. We agree.

#### A. Applicable Law and Standard of Review

¶ 9 A parent is unfit if their conduct or condition renders them unable or unwilling to give a child reasonable parental care. § 19-

3-604(2); *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006). A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs" and may be considered in determining unfitness. *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 10     Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. *L.M.*, ¶ 17. We review the court's factual findings for clear error, but we review its legal conclusions based on those facts de novo. *S.R.N.J-S.*, ¶ 10. Whether the evidence establishes that a parent is unfit is ultimately a legal conclusion because its resolution requires application of the evidentiary facts to the termination statute. *Id.* at ¶ 11.

## B.    Fitness

¶ 11    The Department did not allege that father had substance abuse or mental health issues.  He generally cooperated with the Department, though his relationship with the primary caseworker deteriorated after father accused the caseworker of making racially discriminatory comments concerning his status as a Black single father.[2]

¶ 12    The juvenile court's finding of unfitness focused on two main areas of concern: father's stability and his ability to parent the child full-time.  We therefore look at each issue in turn to determine if clear and convincing evidence supported the court's finding of unfitness.

---

[2] The court found that the caseworker was not "acting with racial animus."  We have no reason to question that finding, though we disagree with the court's basis for it.  The court appeared to rely, at least in part, on the caseworker's testimony that she identified as "half [B]lack."  However, we note that color discrimination can occur between people of the same race or color.  *See, e.g., Castaneda v. Partida*, 430 U.S. 482, 499 (1977) ("[I]t would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.").  Well-known studies have confirmed this concept.  *See, e.g.,* Simon Howard & Kalen Kennedy, *The "Doll Studies," Kenneth B. Clark and Mamie P. Clark, 1947, in* Essays in Developmental Psychology 54 (Charles Golden ed., 2025), https://perma.cc/FPZ6-QJB3.

## 1. Stability

¶ 13     The juvenile court found that, at the time of the termination hearing, father had appropriate and stable housing with a dedicated space for the child. This finding was supported by the evidence.

¶ 14     Both the caseworker and the family time supervisor testified that they did not have concerns regarding father's home. And the court admitted photographs of father's home into evidence, which reflected that he had a dedicated space for the child including a toddler bed and age-appropriate toys.

¶ 15     Despite this evidence, the court expressed concern that it took father the length of the case to obtain his own housing, stating "[o]nly now, in the last month, does [father] have stable housing." In so finding, the court noted that father (1) was working in Florida when the case began; (2) did not return to Colorado until eight months after the petition was filed; and (3) upon his return to Colorado, lived with roommates and refused to provide their identifying information to the caseworker. The Department and GAL argue that the evidence supports these findings and that the findings prove that father was unfit.

¶ 16     True, when the case began, father was working as a plumber in Florida and did not return to Colorado until eight months after the petition was filed.  But, for approximately the first three months, father was awaiting genetic testing to confirm paternity.  Once paternity was established, he completed his work commitments in Florida, sold some property to obtain necessary funds to relocate, and returned to Colorado.  According to the caseworker's reports, while father was in Florida, he had regular contact with the Department, the child, and the child's placement provider.  Father returned to Colorado within two months of the adoption of the treatment plan.  The court did not explain why this chronology proved that father was unfit — i.e., that father was unable or unwilling to provide appropriate care for the child.

¶ 17     Once in Colorado, father promptly began renting a room in a home with several roommates.  A temporary caseworker visited the residence and "felt it was appropriate safety-wise," but father acknowledged that his roommates would not pass background checks, so he chose to exercise his visits in the community while he worked to find a suitable residence for the child.  Father remained

there until he obtained his own residence, with a year-long lease, two months before the hearing.

¶ 18    The record shows that father had housing since moving to Colorado. At the time of the hearing, father had a stable and appropriate residence for the child. He also had social security income and continued to work as a plumber. There was no evidence presented that father could not meet the child's financial or housing needs. Thus, we cannot conclude that, simply because it took father several months to establish appropriate housing for the child, this proved by clear and convincing evidence that father was unfit. *See id.* at ¶ 46 (holding that the juvenile court erred by discounting evidence of a parent's safe and stable residence based on evidence of past housing struggles).

## 2.    Ability to Parent the Child

¶ 19    The juvenile court also found that father had "not shown any ability . . . to be a full-time parent to [the child]." As noted, when the case began father resided out-of-state and had virtual visits with the child. The court found, with record support, that father generally ended the visits early. However, at that time, the child

8

was an infant, and the juvenile court acknowledged that the child was unlikely to engage via video for a full hour.[3]

¶ 20    Once father relocated to Colorado in May 2024, he actively and consistently engaged in in-person family time.  *See id.* at ¶ 25 (finding that the father's lack of visits with the children during the first year the case was open because he lived in Mexico did not render him unfit, as he consistently attended visits upon relocation to Colorado).  Indeed, the caseworker testified that during the eight-month period between his return to Colorado and the termination hearing, father missed a total of four of his twice-weekly visits —

---

[3] In her May 2024 report to the court, the caseworker stated that father

> has attended virtual visits with [the child] regularly; however, given [the child's] age it has been very hard to engage and interact with him through a screen.  [Father] has been reported to communicate with [the child] and ask his caregiver about how he has been doing.  [Father] has been very proactive about getting visits set up and has reached out to [multiple] different people when he had an interruption in visits to get those rescheduled.

two due to medical procedures and two due to illness.[4] (The caseworker nonetheless characterized father's visitation as "[v]ery spotty" and "intermittent." She faulted him for not scheduling his medical procedures around his visitation schedule and for not coming to visits when he was sick.) Thus, the evidence established that father attended approximately ninety percent of his family time. *See id.* at ¶ 24 (holding that a "few missed visits" were not sufficient to establish by clear and convincing evidence that the parent failed to provide reasonable parental care).

¶ 21     The Department had no concerns about father's visits with the child. The evidence was undisputed that father was attentive and engaged at visits, that he did not need correction from the family time supervisor, and that he and the child were bonded. The court

---

[4] This testimony was consistent with the caseworker's additional testimony that "a handful of times," father either canceled a visit or ended the visit early, although during that part of her testimony, the caseworker said that father had, in addition to canceling visits for medical appointments, also canceled or ended a visit early due to work obligations. The family time supervisor testified that she had no concerns about the number of visits that father missed and nothing in the record otherwise shows that the few missed visits for medical or work reasons affected father's ability to meet the child's needs.

noted that the family time supervisor "was impressed by [father's] parenting skills."

¶ 22    Despite this evidence, the juvenile court found father to be unfit because he (1) previously expressed interest in terminating his rights; (2) was still only exercising supervised family time, and (3) had not shown an ability to parent full-time.

¶ 23    During his testimony, father acknowledged that about six months before the termination hearing, he had expressed concern about his ability to care for the child because he was undergoing testing for a serious medical condition that had also afflicted his mother.  But the test result was negative, and father testified that he did not have health problems that would impact his ability to care for the child.  And father expressed his desire to parent the child.

¶ 24    As for family time, the record shows that the Department either disregarded, or delayed implementation of, the family time supervisor's recommendations.

¶ 25    The caseworker initially testified that there was "no recommendation for [father] to have monitored or unsupervised time."  That turned out to be false.  The family time supervisor's

reports showed that beginning in September 2024 — and in every monthly report thereafter — the supervisor recommended decreasing the level of supervision. When confronted with the reports at the termination hearing, the caseworker admitted that she did not recall the recommendations but then insisted she had discussed the recommendations with others, just not with father or his lawyer or during any regularly scheduled team meeting. The caseworker agreed that the family time supervisor was "the person in this whole case who's had the most contact with" father and the child, and that she relied on the supervisor's recommendations about visitation. Still, the caseworker did not explain why the Department did not follow the supervisor's repeated recommendation to decrease the supervision level at visits.

¶ 26 The caseworker also testified that "there was an opportunity for [father] to expand his visits" and that "he chose not to." That also turned out to be wrong. When father began in-person visitation in May 2024, the Department allowed two-hour visits twice a week. Almost immediately, the family time supervisor recommended increasing family time. Father (through his lawyer) followed up with his own request for additional time. The

Department did not approve expanded visits until October 2024, a few months before the termination hearing. Visitation was increased from four hours a week to six hours a week.

¶ 27     The court's conclusion that father was unfit was based in large part on its finding that father "is still having supervised parenting time" and that the child needed a "full-time parent, not a parent for six hours a week." But the record demonstrates that any lack of progress on that front was attributable to the Department. And, maybe more importantly, there was no evidence that father could not safely parent the child for more than six hours per week.

¶ 28     The primary caseworker who testified at the hearing had never attended a visit between father and the child. The temporary caseworker attended only one. The family time supervisor was present at all of father's visits from June 2024 through December — approximately fifty, according to the evidence.

¶ 29     In her September 2024 report to the Department, the family time supervisor reported that

> [father] continues to be prepared with supplies for his son and engages with baby the entire parenting time. Continued follow through for parenting expectations and care of a young child. [Father] is always prepared with food

and drink for baby. [Father] sends home books to placement for [the child] and his big sister. [Father] consistently interacts and engages with son during scheduled visits.

¶ 30　　The family time supervisor's December "record of contact" detailed father's engagement with the child during the visit and stated that "[father] continues to be prepared and ready for [family time]." The only challenges listed were "[c]ommunicating with [p]lacement and scheduling make up time."

¶ 31　　At the termination hearing, the family time supervisor confirmed that "there [had] [n]ever been a time . . . where [she was] concerned about the interaction with [the child] and [father]" or a time "where [father] d[id] not attend to [the child's] needs." She explained that the child "knows when he's with [father] that [father] will meet his needs and care for him and provide what [the child] needs."

¶ 32　　The family time supervisor's observations were not disputed. The caseworker generically opined that father was not "able to have [the child] full-time, unsupervised," but she testified that her opinion was based entirely on her (mistaken) belief that there was never a "recommendation for [father] to have monitored or

14

unsupervised [family] time." In that way, the caseworker conceded that she was basing her opinion on the family time supervisor's assessment of father's parenting abilities — she was just mistaken about the supervisor's assessment.

¶ 33    The uncontested evidence showed that father could provide appropriate care for the child during all of the parenting time allotted to him. The juvenile court, though, appeared to expect father to prove his ability to care for the child full-time, rather than requiring the Department to prove that, notwithstanding his success at family time, father was unable or unwilling to provide appropriate care on a full-time basis. In other words, the court improperly shifted the burden to father to show fitness, rather than requiring the Department to prove by clear and convincing evidence that he was unfit. *See id.* at ¶ 8; *see also People in Interest of S.N-V.*, 300 P.3d 911, 914 (Colo. App. 2011) ("The constitutional and statutory due process requirements for a termination hearing place no duty on a respondent parent."). True, as the Department and GAL assert, a parent is required to use the services provided by the Department to comply with his or her treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). But, as

discussed above, father engaged in the family time provided to build a relationship with the child and learn his needs — the key component of father's treatment plan.

¶ 34     At the hearing, the Department and GAL argued that father should have demanded expanded family time with lower supervision, presumably so that he could have demonstrated his ability to parent the child for longer periods.  To the extent the juvenile court adopted that view, it erred.  It is not the parent's responsibility to demand appropriate family time.  The Department, not the parent, has the obligation to review the family time supervisor's reports and implement the recommendations if appropriate in order to ensure the parent's progress toward reunification with the child.  *See* § 19-3-208(2), C.R.S. 2025 (detailing the services the Department must provide as determined by individual case planning, including family time, with the goal of "speedy reunification of parents with . . . their children" in mind).

¶ 35     That leaves the Department and GAL's argument that the court's unfitness determination is supported by evidence that father failed to take an eight-hour parenting class or to prove that he had a support system to help him care for the child.

¶ 36 Father did not complete the class as required by his treatment plan. However, the caseworker acknowledged that the family time supervisor never raised any concerns about father's parenting ability or his need for a parenting class. Additionally, father has a grown daughter who, at the time of the termination hearing, was preparing to take the bar exam to become a licensed attorney. Thus, father did not feel the class was needed, but he testified that he would be willing to complete the class if necessary for the safety of the child. While the juvenile court initially found that the lack of completion of this one-hour, six-to-eight-week class was not "conclusive" or "essential," the court later focused on this as an example of father's failure to comply with his treatment plan. Due to the limited scope of the class, the other evidence of father's parenting abilities, and the inconsistent nature of the juvenile court's findings, we cannot agree that father's failure to complete the class proves by clear and convincing evidence that he was unfit.

¶ 37 The Department and GAL also assert that father lacked a support system because he was estranged from his older daughter (she was angry upon learning that father had a second child), did not provide the Department information about his fiancée, was

17

initially reluctant to involve other family members in the case, and did not know the name of the neighbor whom he planned to hire as a babysitter. But the record demonstrates that, at the time of the hearing, father and his older daughter had reconciled, two of his nephews testified and expressed their support for him and willingness to assist with childcare, and he was able to provide the name of his proposed babysitter (a neighbor who had cared for her grandchild) during his testimony.

¶ 38    At the termination hearing, the Department's counsel encouraged the court to terminate father's parental rights because "he doesn't really have a solid plan for taking care of [the child] for the next 17 years." We wonder what sort of seventeen-year plan counsel thought father should have presented to the court to prove his fitness. And we are troubled by the Department and the court's focus on the fact that father's job might sometimes require him to leave the child with family members or a babysitter. As another division has aptly pointed out, "[M]ost (perhaps all) working parents face [work-related] scheduling conflicts at one time or another. Grappling with such conflicts doesn't, on its own, make them legally unfit." *S.R.N.J-S.,* ¶ 28.

18

¶ 39    At any rate, the Department and GAL do not point us to any authority requiring a parent to establish an outside support system before they can be found fit, and we are not aware of any.

## C.    Harmless Error

¶ 40    While the Department and GAL encourage us to find any error to be harmless, they develop no such argument. We therefore decline to address this issue further. *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (declining to address an appellate argument presented without supporting facts, specific argument, or supporting authorities).

## D.    Conclusion

¶ 41    After reviewing the record, we conclude that the juvenile court erred by (1) determining that the Department proved by clear and convincing evidence that father was unfit; and (2) shifting the burden to father to prove his fitness. (We do not hold that father was or was not a fit parent, only that the court erred by concluding that the Department met its burden to prove father's unfitness.)

## IV. Disposition

¶ 42　The judgment is reversed, and the case is remanded to the juvenile court.[5]

JUDGE FOX and JUDGE SCHUTZ concur.

---

[5] Because we have concluded that the juvenile court erred with respect to its determination of unfitness, we need not address father's other contention that the juvenile court erred by finding that he could not become fit within a reasonable time.