25CA1438 Peo in Interest of EN 03-12-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1438
Arapahoe County District Court No. 24JV96
Honorable J. Robert Lowenbach, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of E.N. and A.T.N., Children,

and Concerning B.M.N. and E.R.H.,

Appellants.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE GOMEZ
Pawar and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 12, 2026

---

Ron Carl, County Attorney, Writer Mott, Deputy County Attorney, Rebecca M. Taylor, Senior Assistant County Attorney, Jordan Lewis, Assistant County Attorney, Littleton, Colorado, Tamra White, Assistant County Attorney, Aurora, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem for E.N.

Josi McCauley, Counsel for Youth, Superior, Colorado, for A.T.N.

Harald Van Gaasbeek, Office of Respondent Parents' Counsel, Fort Collins, Colorado, for Appellant B.M.N.

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant E.R.H.

¶ 1 In this dependency and neglect case, B.M.N. (mother) appeals the judgment terminating her parent-child legal relationships with E.N. and A.T.N. (the children), and E.R.H. (father) appeals the judgment terminating his parent-child legal relationship with E.N. We affirm.

## I. Background

¶ 2 The Arapahoe County Department of Human Services filed a petition in dependency or neglect based on allegations that the parents used drugs in the hospital room following the birth of the younger child, E.N., and based on mother's admission that she used methamphetamine and alcohol during the pregnancy. The petition also alleged unsafe living conditions — specifically, that the residence was dirty, cluttered, and smelled like marijuana.

¶ 3 The Department later amended the petition to include mother's older child, A.T.N, who was then ten years old. (Father is not A.T.N.'s father.) Mother had been working with the Department voluntarily regarding the older child due to concerns about drug use, domestic violence, and the child not being in school. The Department placed the children with maternal aunt, where they remained for the duration of the proceedings.

¶ 4     Both parents admitted the allegations of the petition, and the juvenile court adjudicated the children dependent and neglected. The court then approved a treatment plan for each parent requiring them to: (1) maintain caseworker contact and cooperate with the Department; (2) provide safe and stable housing and maintain a legal income; (3) complete a mental health assessment and follow all treatment recommendations; (4) complete a substance abuse evaluation and follow its recommendations, including drug testing and demonstrated sobriety; (5) engage in family time; (6) refrain from criminal activity; and (7) participate in domestic violence treatment.  Shortly thereafter, father was arrested.  He was incarcerated for the remainder of this case.

¶ 5     The Department later moved to terminate parental rights, and the juvenile court conducted a two-day termination hearing.  Fifteen months after the Department filed the petition, the juvenile court terminated the parent-child legal relationships.

¶ 6     Mother and father both appeal the termination judgment.

## II.     Mother's Fitness

¶ 7     Mother argues that the juvenile court erred when it found that she was unfit and unlikely to become fit within a reasonable time. We are not persuaded.

### A.     Applicable Law and Standard of Review

¶ 8     To terminate a parent-child legal relationship, clear and convincing evidence must establish, among other things, that the parent is unfit and that the parent's conduct or condition is unlikely to change in a reasonable time.  § 19-3-604(1)(c)(II)-(III), C.R.S. 2025.  An unfit parent is one whose conduct or condition renders them "unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions."  § 19-3-604(2).

¶ 9     In determining whether a parent's conduct or condition is likely to change within a reasonable time, "the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition."  *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.  The court need not give a parent additional time,

even when the parent has made some recent progress on the treatment plan.  *Id.* at ¶¶ 24, 28-29.

¶ 10    A juvenile court's termination of parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts.  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.  We review the court's factual findings for clear error, meaning we will accept the findings if there is record evidence to support them, but we review de novo the court's legal conclusions based on those findings.  *Id.*

¶ 11    The credibility of the witnesses, as well as the sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions to be drawn from the evidence, are all subject to the juvenile court's discretion.  *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

¶ 12    Additionally, when a child is under six years old, as one of the children was here, the juvenile court must consider the expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible.  *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025.

## B. Analysis

¶ 13    As an initial matter, we disagree with mother's assertion that the juvenile court misapplied *K.D. v. People*, 139 P.3d 695 (Colo. 2006), in considering her outstanding warrants, and the resulting possibility of arrest and incarceration, as part of its determination regarding parental fitness. It is true that the supreme court held in *K.D.* that "[p]arental incarceration alone is an insufficient basis on which to terminate parental rights." *Id.* at 700. But the juvenile court here did not terminate mother's parental rights based solely on her potential incarceration. To the contrary, the court considered mother's potential incarceration among "a number of reasons" supporting its conclusion that mother was unfit and unlikely to become fit within a reasonable time. And the court's finding that mother "will not be available to parent appropriately because of the likelihood of arrest on multiple warrants" is consistent with the supreme court's recognition in *K.D.* that a court may "consider[] even a relatively short period of parental incarceration as a significant factor in determining fitness," particularly if it affects the parent's ability to "provide a stable home atmosphere for the child within a reasonable period." *Id.* at 701-02.

5

¶ 14    We also disagree with mother's assertions that the juvenile court's conclusion on fitness is undermined by the evidence of her successful engagement in family time and the lack of evidence of any failure to complete the domestic violence objective of her treatment plan. Even if mother complied in full or in part with these components of her treatment plan, the court concluded that she remained unfit for other reasons, including, in particular, her excessive use of controlled substances. *See People in Interest of K.B.*, 2016 COA 21, ¶ 26 (even substantial compliance with a plan may not be sufficient to render a parent fit).

¶ 15    Turning to her substance abuse, Mother takes issue with the court's findings, noting that she had made recent progress on that aspect of her treatment plan. For example, mother notes that she had entered a residential substance abuse treatment program and had provided negative urinalysis tests over a two-week period. The court acknowledged mother's recent steps to address her substance use but still found that she had made little progress on her treatment plan and concluded that her conduct or condition was unlikely to change within a reasonable period.

¶ 16    The record supports the court's findings as well as its ultimate conclusion on fitness. The Department presented evidence that mother did not achieve sobriety. At the time of the caseworker's last home visit, mother was still actively using substances and wasn't taking accountability for her substance use. The family time supervisor testified that she suspected that mother had used substances while at the Department and had been under the influence during family time visits. Mother herself testified that she'd "recently" had "a problem with substance abuse."

¶ 17    Additionally, the caseworker testified that mother didn't consistently comply with urinalysis testing. Although she'd recently had two negative uranalysis tests, every single test before that time had come back positive for fentanyl and methamphetamines, including a test submitted less than a month before the termination hearing. The caseworker also testified that mother was unsuccessfully discharged from inpatient substance use treatment twice. And mother conceded that she hadn't successfully completed any substance use program.

¶ 18    Mother didn't comply with other aspects of her treatment plan as well. The juvenile court took judicial notice of three criminal

cases in which mother had active warrants for failures to appear. And the caseworker testified that mother had been arrested twice since the caseworker took over the case. The caseworker also testified that mother had been "going from one family [or friend] to another" since being evicted from an apartment and that she hadn't provided any documentation of employment.

¶ 19     Ultimately, the caseworker opined that mother was not a fit parent because she hadn't complied with her treatment plan. The caseworker further opined that, even if mother became compliant, it would still take a year for her to meet all the requirements of her treatment plan, and that it wasn't in the children's best interest to extend the case for that long.

¶ 20     Because the record supports the court's findings, as well as its ultimate conclusion that mother was unfit and unlikely to become fit within a reasonable time, we have no basis to disturb the court's ruling on fitness. *See S.R.N.J-S.,* ¶ 10.

### III.     Less Drastic Alternative

¶ 21     Mother also argues that the juvenile court erred by finding that there was no less drastic alternative to termination, as an

allocation of parental responsibilities (APR) to maternal grandmother was a viable less drastic alternative.  We disagree.

A.    Applicable Law and Standard of Review

¶ 22    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives.  *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3); *L.M.*, ¶ 29.  The court may also consider other factors, including the child's need for permanency.  *L.M.*, ¶ 29.

¶ 23    For a less drastic alternative to be viable, it must do more than just "adequately" meet a child's needs; it must be the "best" option for the child.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 27.  If the court considers a less drastic alternative but finds instead that termination is in the child's best interests, the court must reject the less drastic alternative and order termination.  *Id.* at ¶ 32.  And we must affirm the court's decision if its findings are supported by the record.  *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Analysis

¶ 24    Mother first argues that there was insufficient evidence to support the juvenile court's finding that an APR to grandmother was not in the children's best interest. But the record supports the court's findings that no alternative short of termination would adequately serve the children's best interest and that the children needed permanency.

¶ 25    The court didn't make any specific findings regarding the children's safety beyond the general finding that no alternative to termination would serve the children's best interest. But the evidence showed that grandmother's home was not safe for the children. Mother's fourteen-year-old son was living with grandmother pursuant to an APR from a different case. Mother testified that she reported her teenage son for potentially sexually assaulting one of the children. And the caseworker testified that "there was a finding within our Department that he did sexually assault" one of the children. The caseworker opined that, based on these allegations, it would not be appropriate for the children to be placed with grandmother. In arguing that the evidence regarding these allegations was "incorrect," mother effectively asks us to

reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do. *See A.J.L.*, 243 P.3d at 249-50.

¶ 26 The caseworker further testified that, even if grandmother was an appropriate placement, an APR would not be in the children's best interest because mother was living with grandmother. As discussed above, mother didn't complete her treatment plan, was actively using substances in grandmother's home, and hadn't mitigated the Department's safety concerns.

¶ 27 Next, mother argues that the court erred because the juvenile court found that other permanency options would require that the children be moved to a new home, which would cause "a traumatic transition," and no evidence supported this finding. Although the term "traumatic transition" does not otherwise appear in the record, the record supports the court's general finding that a transition to a new home would not be in the children's best interests. The caseworker testified that A.T.N. had been with maternal aunt for "a couple of years," and E.N. had been with her for his whole life. The caseworker explained that the children needed consistency and stability and, in particular, that A.T.N. needed to process "the trauma" that was "created [by] this process and this case being

11

open" and needed to "begin her life outside of the ongoing safety concerns that ha[d] not been mitigated" by the parents. The caseworker also explained that the aunt was meeting the children's emotional and medical needs.

¶ 28 Finally, mother argues that the juvenile court failed to determine if the children's placement was appropriate and left that determination to another court. But the court found that the children's current home was "consistent" and "nurturing," would "provide permanence," and "appear[ed] to be an appropriate placement." To the extent that mother argues the court erred when it noted that the "adoption court" would determine whether the children's placement was appropriate for adoption, her argument is unavailing because "when a court concludes that termination is in a child's best interests . . . the child does not need to be in a potentially adoptive home." *People in Interest of H.L.B.*, 2025 COA 86, ¶ 20; *see also People in Interest of T.E.M.*, 124 P.3d 905, 910-11 (Colo. App. 2005) (declining to disturb a juvenile court's rejection of placement with a relative as a less drastic alternative and its determination that termination and adoption were in the children's best interests "whether or not they were ultimately adopted").

¶ 29    We therefore decline to disturb the juvenile court's conclusion that there was no less drastic alternative to termination.

## IV.    Reasonable Efforts

¶ 30    Father asserts that the Department failed to provide reasonable efforts once he became incarcerated because it (1) took months to contact the jail where he was incarcerated to ascertain what services were available; (2) never informed the jail of his treatment plan; (3) never followed up to set up mental health treatment; and (4) didn't set up any family time visits with E.N. while he was incarcerated.  We discern no basis for reversal.

### A.    Applicable Law

¶ 31    Before a juvenile court may find a parent unfit, the county department of human services must make reasonable efforts to rehabilitate the parent and reunite the family.  §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2025.  Reasonable efforts mean the "exercise of diligence and care" to reunify parents with their children.  § 19-1-103(114).

¶ 32    Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114).  Thus, a department must provide, among other things, individual case

13

plans, referrals to available public and private assistance resources, family time services, and placement services. § 19-3-208(2)(b). And if funding is available, a department must provide mental health services and drug and alcohol treatment services. § 19-3-208(2)(d).

¶ 33    In assessing a department's provision of reasonable efforts, a court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

¶ 34    A parent's incarceration does not excuse a department from making reasonable efforts. *See* § 19-3-508(1)(e), C.R.S. 2025. When the department learns of a parent's incarceration, it must communicate with the facility where the parent is held regarding the requirements of the parent's treatment plan and provide information to the court detailing the services and treatment available to the parent at that facility. § 19-3-508(1)(e)(I), (III). If the caseworker is unable to determine any treatment or services

available to the parent, they must still report their efforts to obtain such information. § 19-3-508(1)(e)(III).

B.    Analysis

¶ 35    As to father's arguments concerning the Department's communications with the jail regarding father's treatment plan and available services, the juvenile court found that, although the Department made "many" reasonable efforts, the court expected more timely communication. Nonetheless, the court found that timely communication would not have made a difference in father receiving treatment and that "the failures of the caseworker were not the reason that the treatment plan failed."

¶ 36    The court's findings are supported by the record. The caseworker testified that she contacted the jail two months after father's incarceration to determine if it offered any "educational classes, group sessions, [or] therapy sessions." But father was "put on disciplinary lockdown" and transitioned to maximum security for "behavioral issues," which limited his access to services. The caseworker testified that father told her that "the jail itself [did] not provide any services whatsoever." The caseworker informed father that he still had access to individual therapy while on lockdown,

15

but that he had to make the request for therapy himself.  But even after the caseworker advised father to enroll in individual therapy, he never did so.

¶ 37    Nothing in the record suggests that, had the caseworker timely investigated or reported about the limited jail-based services available to father, it would've made a difference in the outcome of the case.  This is especially so given the juvenile court's record-supported findings that father picked up new criminal charges for conduct he committed after the treatment plan was in place; that in the resulting proceedings, father stipulated to an eight-year-sentence, which meant he wouldn't be available to parent E.N. for several years; that father "fail[ed] to access [mental health therapy] that was available in the jail"; that almost no other pertinent services were available to father at the jail; that father "ha[d] been hostile to the efforts of the Court and [the Department] to address his unfitness" and was "predispos[ed] not to comply with the treatment plan"; and, for all those reasons, that father's conduct or condition was unlikely to change within a reasonable time.  *See People in Interest of C.C.*, 2022 COA 81, ¶ 20 ("An error affects a substantial right only if 'it can be said with fair assurance that the

16

error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'") (citation omitted).

¶ 38    And as to father's final argument concerning family time during his incarceration, the juvenile court found that the visitation supervisor used reasonable efforts in an attempt to secure family time. In particular, the court noted that the supervisor spent a lot of time trying to set up virtual visits, arranged to have the child present while waiting on the line for visits, and relied on messages that father had terminated the call.

¶ 39    The family time supervisor testified that she "attempted many solutions" to facilitate family time while father was incarcerated and that she followed the jail's process to set up visitation. The child was brought to the Department weekly for over six months to attempt video visits with father at the jail. But when the supervisor waited with the child on the line for a visit, the call would terminate with a message that "the [inmate] had ended the call." The supervisor tried calling the jail ahead of time to allow them to locate father for the visit. When that didn't work, the supervisor notified father's attorney about her struggles in securing family time.

17

Ultimately, the supervisor concluded that there was nothing else she could have done to facilitate family time for father at the jail.

¶ 40 Thus, the record supports the juvenile court's conclusion that the Department made reasonable efforts attempting to secure parenting time for father while he was incarcerated.

## V. Disposition

¶ 41 The judgment is affirmed.

JUDGE PAWAR and JUDGE JOHNSON concur.