In the Interest of K.D., a minor child.

**K.D., Petitioner**

v.

**The PEOPLE of the State of Colorado, Respondent.**

No. 05SC808.

Supreme Court of Colorado, En Banc.

July 31, 2006.

Leo L. Finkelstein, Colorado Springs, Colorado, Attorney for Petitioner.

Nancy J. Walker–Johnson, Monument, Colorado, Guardian ad litem for K.D., a minor child.

El Paso County Department of Human Services, Andrew C. Gorgey, Chief Deputy County Attorney, William Louis, County Attorney, Colorado Springs, Colorado, Attorneys for Respondent.

Justice MARTINEZ delivered the Opinion of the Court.

In this termination of parental rights case, Petitioner–Father, K.D. ("Father"), seeks review of the court of appeals holding affirming the trial court's order terminating the parent-child legal relationship between him and his son, infant K.D. ("K.D."). *People ex rel. K.D.*, No. 05CA0199, 2005 WL 2803114 (Oct. 27, 2005) (not selected for official publication). We consider whether the trial court improperly relied upon Father's criminal conviction and resulting incarceration to work a forfeiture of parental rights under section 19–3–604(1)(c), C.R.S. (2005).[1] We conclude it did not and affirm the court of appeals.

## I. Facts and Proceedings

On May 13, 2002, the El Paso County Department of Human Services (the "County") filed a Petition in Dependency and Neglect for K.D., the two-year-old child of J.M. ("Mother") and Father.[2] At all times relevant to these proceedings, K.D. was under six years of age.

The Petition alleged that because of Mother's suicidal ideations and depression, she

---

1. Because the relevant statutes remain unchanged, we cite the current statutory compilation.

2. This County also sought to adjudicate a second child of Mother's, K.D.'s half-brother, dependent and neglected.

was unable to provide a safe and stable environment for K.D. Mother admitted the allegations in the Petition and K.D. was adjudicated dependent and neglected as to Mother.

Father's whereabouts were unknown. Mother requested that service by publication of the petition in dependency and neglect be held in abeyance as to Father based on a safety risk to Mother. Mother feared for her safety due to an alleged history of domestic violence between Mother and Father. Father was found residing in a Texas prison, where he was serving a four-year sentence for two counts of domestic violence causing bodily injury and one count of driving while intoxicated.

K.D. was adjudicated dependent and neglected as to Father on or about October 29, 2002. A treatment plan was subsequently approved by the trial court. The treatment plan required Father to take a parenting class, maintain a job, complete a mental health evaluation, and participate in group therapy during his incarceration.

The legal and physical custody of K.D. was returned to Mother on August 1, 2003. However, K.D. was placed back in foster care on April 21, 2004, upon Mother's request.

On May 19, 2004, the County moved to terminate the parent-child legal relationship between K.D. and Mother and Father. The County asserted the trial court had approved an appropriate treatment plan for K.D. and Father, but that Father failed to reasonably comply with the terms of the treatment plan and that the plan had failed to rehabilitate Father. In addition, the motion alleged Father had had no contact with K.D. since his incarceration, that he had surrendered physical custody of K.D. for a period of more than six months and had not manifested the firm intention to resume physical custody of K.D. or made permanent legal arrangements for the care of K.D. during this period of time. Thus, the County alleged, pursuant to C.R.S. section 19–3–604(1)(a)(I) (2005), no appropriate treatment plan could be devised for Father and his parental rights should be terminated. Finally, the County asserted Father was an unfit parent and the conduct or condition rendering him unfit was unlikely to change in a reasonable time.

The County also moved for a permanency placement hearing under section 19–3–702, C.R.S. (2005), on the basis that there was not a substantial probability that K.D. would be returned to the physical custody of his parents within six months because Father was incarcerated and Mother previously relinquished her parental rights.

The court denied the motion for termination of the parent-child relationship as to Father on the basis that it was not proved by clear and convincing evidence that Father had abandoned K.D. The court found Father had reasonably complied with the treatment plan.

The court did note, however, that Father's testimony raised concerns regarding domestic violence and his criminal history. The court ordered the County to prepare an amended treatment plan of a short-term duration, with treatment goals approximately ninety days from the time of its adoption. The amended treatment plan was approved by the court on July 23, 2004, and required Father to enroll and participate in a parenting class, to secure a job upon his release from prison, to find appropriate housing for him and his son after prison, to establish a healthy relationship with his son while he was in prison, to attend a thirty-six week domestic violence class, and to enroll and participate in a drug and alcohol program.

The County filed a second motion for termination of the parent-child relationship on October 27, 2004. In its motion, the County alleged numerous statutory bases for terminating Father's parental rights, including the factors for termination addressed in section 19–3–604(1)(c).

Father was denied parole on December 3, 2004. At the second hearing to terminate Father's parental rights, the court heard the testimony of William Seigman of the Texas Department of Criminal Justice, who testified by telephone regarding the denial of Father's parole. Seigman indicated that Father was denied parole, in part, because the parole board considered him a continued threat to society. The court also heard the testimony of the caseworker and K.D.'s therapist. The caseworker stated that Father

had not complied with the treatment plan. K.D.'s therapist indicated that K.D. had a strong relationship with his foster-adopt family. Both the caseworker and therapist urged the immediate placement of K.D. in a permanent home. Father testified via telephone during the hearing.

The court terminated Father's parental rights pursuant to section 19–3–604(1)(c). In this regard, the court found K.D. was adjudicated dependent and neglected, the court had adopted an appropriate treatment plan and the County filed a timely motion for termination. The court further found by clear and convincing evidence that Father failed to reasonably comply with the treatment plan and that the plan failed to rehabilitate him.

For these reasons, the court found Father an unfit parent and concluded he was unlikely to change within a reasonable time. The court also found termination of the parent-child legal relationship to be in K.D.'s best interests.

Father appealed. In an unpublished opinion, the court of appeals affirmed the termination. Recognizing that the trial court considered Father's continued incarceration as a significant factor affecting his ability to parent K.D. and that Father was not in a position to parent K.D. due in part to Father's continued incarceration, the court of appeals observed:

> [A]lthough [F]ather had completed numerous programs in prison, and even if we agree[d] with his argument that he had substantially complied with the amended treatment plan, he still was not in a position to parent his child. While [F]ather's continued incarceration was a significant factor in the trial court's decision to terminate his parental rights, it was not the only factor the court considered. The court also considered the time spent by the child in foster care, the child's age, and the child's need for permanency. Given these considerations, and because the trial court's findings concerning compliance with and success of the treatment plan are supported by the evidence and comport

with applicable law, we will not disturb them on review.

*People ex rel. K.D.,* Slip op. at 9–10.

## II. Analysis

Father contends the juvenile court improperly weighed the interests at stake by focusing on his continued incarceration rather than on his rehabilitative efforts and compliance with his treatment plan. Thus, Father argues, the trial court's order of termination effectively amounted to a forfeiture of his parental rights based upon his continued incarceration. We conclude the court properly considered parental incarceration as one of several significant factors informing K.D.'s best interests. Consequently, we disagree with Father and affirm the court of appeals.

### A. The Children's Code

■ Courts conducting dependency and neglect proceedings must be guided by the purposes underlying Colorado's Children's Code (the "Code"), sections 19–1–101 to 19–6–106, C.R.S. (2005). *L.A.G. v. People ex rel. A.A.G.,* 912 P.2d 1385, 1391 (Colo.1996) (citing *City & County of Denver v. Juvenile Ct.,* 182 Colo. 157, 161–64, 511 P.2d 898, 900–01 (1973); *Johnson v. People,* 170 Colo. 137, 141–42, 144, 459 P.2d 579, 581–82 (1969); *People ex rel. R.E.,* 721 P.2d 1233, 1235 (Colo.App.1986)). The Code strives to preserve the family while simultaneously ensuring the child's best interest and welfare. *See People ex rel. C.A.K.,* 652 P.2d 603, 610–11 (Colo.1982). To wit, the purposes of the Code are:

> (a) To secure for each child subject to these provisions such care and guidance, preferably in his own home, as will *best serve his welfare* and the interests of society;
>
> (b) To *preserve and strengthen family ties* whenever possible, including improvement of home environment;
>
> (c) To remove a child from the custody of his parents only when his welfare and safety or the protection of the public would otherwise be endangered and, in either instance, for the courts to proceed with all possible speed to a legal determination

that will serve the *best interests of the child;* and

(d) To secure for any child removed from the custody of his parents the necessary care, guidance, and discipline to assist him in becoming a responsible and productive member of society.

§ 19–1–102(1), C.R.S. (2005) (emphasis added). The General Assembly implemented expedited placement procedures in designated counties to serve the interests and needs specific to children under the age of six:

[t]he general assembly recognizes the numerous studies establishing that children undergo a critical bonding and attachment process *prior to the time they reach six years of age.* Such studies further disclose that a *child who has not bonded with a primary adult during this critical stage will suffer significant emotional damage* which frequently leads to chronic psychological problems and antisocial behavior when the child reaches adolescence and adulthood. Accordingly, the general assembly finds and declares that it is appropriate to provide an expedited placement procedure to ensure that children under the age of six years who have been removed from their homes are placed in permanent homes as expeditiously as possible.

§ 19–1–102(1.6), C.R.S. (2005) (emphasis added). Under the Code's expedited placement procedures, a child under the age of six must be placed in a permanent home no later than twelve months after the original placement out of the home unless the best interests of the child dictate otherwise. § 19–3–703, C.R.S. (2005).

■ A child may be placed out of the home if adjudicated dependent or neglected as defined in section 19–3–102, C.R.S. (2005). *See* § 19–3–508, C.R.S. (2005). A "dependent or neglected child" includes a child lacking proper parental care through the acts or omissions of the parent as well as a child whose parent refuses to provide care necessary for the child's health, guidance or well-being. *People ex rel. E.A.,* 638 P.2d 278, 283 (Colo.1982); §§ 19–1–102(1); 19–3–102, C.R.S. (2005). In a dependency or neglect hearing, the court determines whether the child lacks "the benefit of parental guidance, concern, protection or support to which he is entitled." *Id.* (internal quotations omitted) (quoting *People ex rel. S.S.T.,* 38 Colo.App. 110, 117, 553 P.2d 82, 89 (1976)). Consistent with the Code's emphasis on the child's best interests, such adjudications "are not made as to the parents but, rather, relate only to the status of the child as of the date of the adjudication." *People ex rel. S.B.,* 742 P.2d 935, 939 (Colo.App.1987) (citing *People ex rel. P.D.S.,* 669 P.2d 627, 627–28 (Colo.App. 1983)).

■ When a child has been adjudicated dependent or neglected, but the decree does not terminate the parent-child legal relationship, the court must approve an appropriate treatment plan to meet the child's needs. § 19–3–508(1), C.R.S. (2005). In approving a treatment plan, the court strives "to preserve the parent-child relationship by assisting the parent in overcoming the problems that required the intervention." *People ex rel. M.M.,* 726 P.2d 1108, 1121 (Colo.1986). Hence, an "appropriate" treatment plan "is reasonably calculated to render the particular [parent] fit to provide adequate parenting to the child within a reasonable time" and "relates to the child's needs." § 19–1–103(10), C.R.S. (2005). "Appropriateness is measured by the likelihood of success in reuniting the family, which must be assessed in light of the facts *existing at the time of the plan's approval." Id.* (emphasis added).

■ A successful treatment plan corrects or improves the parent's conduct or condition or renders the parent fit. *People ex rel. C.A.K.,* 652 P.2d at 611. However, even a parent's substantial compliance with a plan may not render the parent fit. *Id.* Success of a treatment plan involving a child under the age of six cannot be found if

[t]he parent exhibits the same problems addressed in the treatment plan without adequate improvement, including but not limited to improvement in the relationship with the child, and is *unable* or unwilling to provide nurturing and safe parenting sufficiently adequate *to meet the child's physical, emotional, and mental health needs and conditions.*

§ 19–3–604(1)(c)(I)(b), C.R.S. (2005) (emphasis added).

■ Hence, a "reasonable time" is relative and determined by the child's physical, mental, and emotional conditions and needs. § 19–3–604(3), C.R.S. (2005). In determining whether the parent's conduct will meet the child's needs within a reasonable time, the "court may consider whether any change has occurred during the pendency of the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." *People ex rel. D.L.C.*, 70 P.3d 584, 588–89 (Colo.App.2003).

Although treatment plans serve an important role in preserving the parent-child relationship, the court may nonetheless determine that it cannot devise an appropriate treatment plan where

the child has been abandoned as set forth in section 19–3–604(1)(a) and the parents cannot be located, or because the child has been adjudicated as neglected or dependent based upon section 19–3–102(2), or due to the unfitness of the parents as set forth in section 19–3–604(1)(b).

§ 19–3–508(1)(e)(I), C.R.S. (2005). Under these circumstances, a court may terminate the parent-child relationship without devising a treatment plan.

■ Termination of parental rights is a decision of paramount gravity affecting a parent's fundamental interest in the care, custody and management of his or her child. *See People ex rel. M.C.C.*, 641 P.2d 306, 308 (Colo.App.1982). Therefore, the state must exercise extreme caution in terminating such rights. *Id.* Accordingly, strict compliance by the trial court with the appropriate standards for termination of a parent-child relationship is an absolute necessity. *Id.*

Section 19–3–604(1), C.R.S. (2005), sets forth three bases on which the court may terminate the parent-child legal relationship. First, under section 19–3–604(1)(a), a court may terminate parental rights if the child has been abandoned by his or her parents. Second, under section 19–3–604(1)(b), C.R.S. (2005), a trial court may terminate parental rights if it finds by clear and convincing evidence that the child has been adjudicated

dependent or neglected on any ground and that no appropriate treatment plan can be devised to address the unfitness of the parent or parents. § 19–3–604(1)(b). In determining that no treatment plan can be devised to address parental unfitness, the court must rely on: (1) a parent's mental illness and its duration; (2) a single incident that injured or disfigured the child; or (3) the long-term confinement of the parent. Finally, under section 193 604(1)(c), the trial court may, as here, terminate the parent-child relationship upon the finding by clear and convincing evidence that (1) the child has been adjudicated dependent or neglected; (2) an appropriate treatment plan has not been complied with by the parent, has not been successful, or could not be devised; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. *People ex rel. A.M.D.*, 648 P.2d 625, 631 (Colo.1982); *People ex rel. A.N.W.*, 976 P.2d 365, 370 (Colo.App.1999).

Both sections 19–3–604(1)(b) and (1)(c) require a determination that the parent is "unfit." A determination of parental unfitness is intertwined with a determination of the child's best interests. "An unfit parent is one whose conduct or condition renders him or her unable to give a child reasonable parental care. Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, mental, and emotional health needs." § 19–3–604(2), C.R.S. (2005); *People ex rel. D.L.C.*, 70 P.3d at 588. With this background in mind, we turn to parental incarceration as a factor affecting parental fitness.

### B. Parental Incarceration

■ Parental incarceration alone is an insufficient basis on which to terminate parental rights. Prior to the legislature's adoption of the Code in 1963, this court held a felony conviction alone does not work a forfeiture of parental rights: "We cannot hold that every convicted felon, by that fact alone, loses all parental rights in children.... It is not one of the punishments prescribed by law that conviction of a felony works also for forfeiture of parental rights." *Diernfeld v. People,*

137 Colo. 238, 244, 323 P.2d 628, 631 (1958); *see also Ziemer v. Wheeler,* 89 Colo. 242, 242, 1 P.2d 579, 581 (1931) ("The trial court took judicial notice of the fact that plaintiff had, at some time, been convicted of a violation of the prohibitory law of this state, but this fact alone would not justify it in taking from the parent the custody and control of his children."). We did not hold, however, that a trial court is precluded from considering parental incarceration.

With the adoption of the Code, the General Assembly likewise permitted trial courts to consider parental incarceration in termination proceedings. In this regard, the Code makes clear that parental incarceration informs a court's fitness inquiry: The trial court may, and in some cases must, consider parental incarceration in determining fitness. §§ 19–3–604(1)(b)–(1)(c), 19–3–604(2). Concerning the long-term confinement of the parent as a basis for unfitness, section 19–3–604(1)(b)(III) sets forth two relevant classes, those who will be confined for more than six years and those who will be confined for less than six years, but for at least thirty-six months. *People ex rel. E.I.C.,* 958 P.2d 511, 514 (Colo.App.1998). Without regard to the child's age, the trial court may terminate parental rights if the parent is confined and not eligible for parole for at least six years after the date the child was adjudicated dependent or neglected and the court cannot devise an appropriate treatment plan to address parental unfitness. § 19–3–604(1)(b)(III). Alternatively, if the subject child is under the age of six when the petition is filed, the trial court may terminate parental rights if the parent is confined and not eligible for parole for at least thirty-six months after the date the child is adjudicated dependent or neglected and the court cannot devise an appropriate treatment plan to address parental unfitness. § 19–3–604(1)(b)(III).

Section 19–3–604(1)(c) also specifies parental incarceration as a factor informing parental fitness. Section 19–3–604(2) enumerates factors the court "shall consider" in determining a parent "unfit" under section 19–3–604(1)(c). These factors include—but are not limited to—conduct towards the child of a physically or sexually abusive nature; history of violent behavior; a single incident of life-threatening or serious bodily injury or disfigurement of the child; excessive use of intoxicating liquors or controlled substances; neglect of the child; and the length of time the child has been in foster care. § 19–3–604(2).

In addition, the court "shall consider" any one of the bases for a finding of parental unfitness contained in section 19–3–604(1)(b). § 19–3–604(2)(a). Thus, the trial court must consider an incarceration of at least six years after the date the child was adjudicated dependent or neglected and an incarceration of at least thirty-six months after the date a child under the age of six was adjudicated dependent or neglected.

The requirement that a court consider section 19–3–604(1)(b)(III) in determining parental fitness under section 19–3–604(2) does not preclude the court from considering periods of incarceration not specified therein. As noted above, the court must "give primary consideration to the physical, mental, and emotional conditions and needs of the child." § 19–3–604(3), C.R.S. (2005); *People ex rel. M.M.,* 184 Colo. 298, 303, 520 P.2d 128, 131 (1974) (primary and controlling issue in termination proceedings, even though parental rights are at stake, is the determination of what will best serve the interests and welfare of the child). Depending on the particular facts of a case, a period of incarceration under thirty-six months may affect the child's physical, mental, and emotional conditions and needs. Under such circumstances, a period of incarceration for fewer than thirty-six months may affect the parent's ability to become fit within a reasonable period of time. *People ex rel. M.H.,* 10 P.3d 713, 714 (Colo.App.2000). We see nothing in the Code precluding the trial court from considering even a relatively short period of parental incarceration as a significant factor in determining fitness.

Section 19–3–604(2) also requires the trial court to consider that a child has been in foster care for fifteen of the past twenty-two months. § 19–3–604(2)(k), C.R.S. (2005). However, if the child has been in foster care for such duration "due to circumstances be-

yond the control of the parent such as incarceration of the parent for a reasonable period of time," the court is not required to consider this circumstance. § 19–3–604(2)(k)(IV), C.R.S. (2005). This exception does not exclude from consideration "the time the child has been in foster care as a factor bearing upon the larger issue of whether termination is in the best interests of the child." *People ex rel. M.H.*, 10 P.3d at 714 (citing § 19–3–604(3)). Rather, the parental incarceration exception merely makes the duration of foster care a discretionary factor in the fitness inquiry: in determining unfitness, the court shall consider, but not be limited to, the enumerated factors. § 19–3–604(2).

The General Assembly did not intend to prevent a court from considering the duration of foster care and the child's need for permanency in relationship to the length of parental incarceration. Indeed, a court may consider parental incarceration as a factor in determining parental fitness and, thereby, as a factor affecting the needs of a child who has been adjudicated dependent or neglected. If a parent cannot be expected to provide a stable home atmosphere for the child within a reasonable period, the state's compelling interest in the welfare of the subject child justifies the termination of that parent's rights.

## III. Application

■ The credibility of the witnesses and the sufficiency, probative value, and weight of the evidence, as well as the inferences and conclusions to be drawn from it, are within the discretion of the trial court. *People ex rel. C.A.K.*, 652 P.2d at 612 (Colo.1982). Thus, a trial court's findings and conclusions will not be disturbed on review if the record supports them. *Id.*

■ Here, the trial court devised a treatment plan, but subsequently terminated Father's parental rights with K.D. pursuant to section 19–3–604(1)(c) because Father had not reasonably complied with his treatment plan, was unfit, and would not change his conduct within a reasonable time. The record discloses substantial evidence to support the findings of the trial court that Father's parental unfitness was of such duration and

nature so as to render him unlikely, within a reasonable time, to provide care necessary for K.D.

The trial court anticipated that, when the amended treatment plan was approved in July 2004, Father would be paroled from the Texas Department of Corrections. During the termination hearing, the trial court stated: "I think people were anticipating that [Father] was going to be released from the Department of Corrections.... [T]he Court approved the amended treatment for [Father] on July 23, 2004. It was expected, again, that he'd get out of prison. He had between July and December."

As a result, the amended treatment plan contained objectives that could be accomplished only if Father were granted parole. For example, the treatment plan required Father to provide a safe and nurturing environment for K.D. and, once Father was released from prison, to secure and maintain employment and obtain an appropriate residence for himself and K.D.

The denial of Father's parole and his continued incarceration thus precluded his compliance with many aspects of the amended treatment plan. It was further indicated that the earliest date Father would be available to begin compliance with the required treatment plan would be December of 2005. The County's evidence showed that, once released, it could take at least one year before Father could take custody of K.D. Accordingly, the amended treatment plan was not successful.

Of particular concern to the trial court in determining Father's fitness under section 19–3–604(2) was the rationale underlying the denial of Father's parole. William Seigmen, a director of the Texas Department of Criminal Justice's parole division, testified that Father had been eligible for parole since November of 2002, but that parole had been previously denied. Father's release was also denied on December 3, 2004, and he would not be eligible for consideration until December 2005.

Seigman indicated that Father was denied release in part because his good time credit "was not an accurate reflection of his rehabil-

itation and that his release may cause public harm." The trial court remarked on this rationale at the termination hearing: "Disturbing to the Court is [that Father] was eligible for release, he didn't make release because they—the Department of Corrections in Texas believe he is a danger to society. If he is a danger to society, then he is a danger to that little boy."

In addition, the court emphasized that Father was unable to be a "meaningful" father. That is, Father was unable to meet the physical, mental, and emotional needs of K.D.:

> And when I say "meaningful," I mean someone available all the time. The parent there to read to the little boy. The parent there to give him a bath. The parent there to talk to the teachers. The parent there to go see how he's doing in school. The parent to take him to the doctor when he's sick, or for his—his monthly—or for his check-ups as he needs. Somebody there to put Band–Aids on his knees whenever he falls down. That's what we mean when we [say] meaningful dad. . . . [Father] has not been that parent to . . . the little boy, and [Father's] not going to be that parent, because he's gonna be in prison yet for another year.

Also apparent from the testimony of the caseworker was Father's insufficient progress in accepting responsibility for his history of domestic abuse. He blamed the victims of his crimes for provoking his behavior and the military for training him to be aggressive. On these bases, the trial court found Father unfit.

In light of the protracted nature of K.D.'s dependency and neglect proceedings, the court focused heavily on K.D.'s need for a stable environment and for permanency within a reasonable time in terminating Father's parental rights. Father's incarceration, as well as the circumstances of his incarceration, informed the trial court's inquiry into Father's parental fitness and his ability to meet K.D.'s physical, mental, and emotional needs within a reasonable time.

As noted above, the Code places a twelve-month deadline on permanency placements for children who are under six years of age when they are first placed out of the home. At age five, K.D. had been in and out of placement for over two-and-a-half years. He spent twenty-four of the thirty-two months in three separate foster homes. And, having been out of the home for the majority of that time, the trial court concluded "enough was enough" and K.D. could not wait the additional time required for Father to become fit. Indeed, in December 2004, the trial court had already permitted more than twice the allowable time period of twelve months to establish permanency for a child of K.D.'s age. *See* § 19–3–703.

The record established that K.D. needed permanency and stability. When first placed in foster care, K.D. displayed aggressive behaviors and did not understand social limits on his behavior. A caseworker testified that K.D.'s behavioral issues derived from his separation from Mother and domestic violence by Father. K.D.'s caseworker and therapist believed it was in K.D.'s best interests to have an immediate permanency placement. In this regard, the testimony indicated K.D. had a "very strong relationship" with his foster-adopt family, with whom he had been placed for approximately thirty months. In addition, the foster-adopt family was ready, willing, and able to adopt K.D. To provide this permanency, the trial court found it was in the best interests of K.D. to terminate the parent-child relationship.

The record makes clear that the trial court did not simply look at the "fact" of Father's incarceration and terminate his parental rights. Rather, the trial court carefully considered how Father's continued incarceration affected his fitness and his corresponding ability to meet K.D.'s needs within a reasonable time. Hence, we conclude the trial court's termination order enjoys record support and we do not disturb it.

## IV. Conclusion

Accordingly, the judgment of the court of appeals is affirmed.