25CA1359 Peo in Interest of NRR 03-26-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1359
City and County of Denver Juvenile Court No. 22JV30827
Honorable Ann Gail Meinster, Judge

The People of the State of Colorado,

Appellee,

In the Interest of N.R.R., a Child,

and Concerning C.M.R. and C.L.E.,

Appellants.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE WELLING
Tow and Lipinsky, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 26, 2026

Miko Brown, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Sheena Knight, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant C.M.R.

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant C.L.E.

¶ 1    C.M.R. (mother) and C.L.E. (father) appeal the judgment terminating their parent-child legal relationships with N.R.R. (the child).  We affirm.

## I.    Background

¶ 2    In December 2022, the Denver Human Services (the Department) filed a petition in dependency and neglect regarding the then-three-month-old child, who was recovering from heart surgery in a hospital.  According to the allegations in its petition, the Department was concerned about mother's ability to understand the child's medical needs and alleged that she was refusing to allow the child to receive necessary medical treatments.  It also alleged concerns about mother's mental health.  And it noted there was an open dependency and neglect case in another county involving mother and her two older children.  Moreover, the Department alleged that father had been convicted of a sex crime involving a child, had a criminal history involving the same type of charges, and was incarcerated in another state.

¶ 3    The juvenile court granted temporary legal custody of the child to the Department.  When the child was discharged from the

1

hospital, he was placed in the same foster home as his two older half-siblings.

¶ 4    Three months after the case opened, mother admitted the allegations in the petition, and the court adjudicated the child dependent or neglected as to mother. The court then adopted a treatment plan for mother, requiring her to (1) establish and maintain stability; (2) improve her parenting skills and attend family time; (3) cooperate with the Department; and (4) address her mental health issues. Later, the court appears to have amended mother's treatment plan, adding a fifth component requiring her to demonstrate protective capacities and good decision-making skills.[1]

¶ 5    In July 2023, genetic testing confirmed that the child was father's biological son. Consequently, the juvenile court adjudicated father to be the child's legal father. Two months later, father admitted the allegations in the petition, and the court

---

[1] In June 2024, the parties discussed modifying mother's treatment plan to add the fifth component and the Department filed proposed language to be added to the treatment plan. However, we can't find anything in the record indicating that the court formally adopted the fifth component. Nonetheless, the parties proceeded as though it had been adopted, and on appeal, mother doesn't claim any error related to the court's possible failure to formally adopt it.

adjudicated the child dependent or neglected as to him. The court then adopted a treatment plan for father, requiring him to (1) cooperate with the Department; (2) demonstrate the ability to parent the child and attend virtual family time; (3) participate in sex offender treatment; and (4) refrain from engaging in further criminal activity.

¶ 6 The Department later moved to terminate the parents' legal relationships with the child. The juvenile court held a seven-day termination hearing over the course of four months. Approximately two-and-a-half years after the filing of the petition, the court granted the Department's motion to terminate.

## II. The Indian Child Welfare Act

¶ 7 Both parents contend that the juvenile court erred by finding that the Indian Child Welfare Act (ICWA) of 1978, 25 U.S.C. §§ 1901-1963, requirements were satisfied. We disagree.

### A. Applicable Law and Standard of Review

¶ 8 For ICWA's active efforts requirements to apply in a dependency and neglect proceeding, the case must, among other things, involve an Indian child. *See People in Interest of A.G-G.*, 899 P.2d 319, 321 (Colo. App. 1995). "Indian child" is defined as "any

3

unmarried person who is under the age of eighteen" and is either (a) "a member of an Indian tribe" or (b) "eligible for membership in an Indian tribe" and "the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

¶ 9    A mere assertion of Indian heritage, without more, is insufficient to give the juvenile court reason to know that the child is an Indian child and trigger ICWA's notice and active efforts provisions. *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 56. Still, Colorado's ICWA statute places certain requirements upon a department when it has information that "the child may have Indian heritage." § 19-1-126(3), C.R.S. 2024.[2] Under those circumstances, the court must direct the department to "exercise due diligence in gathering additional information that would assist the court in determining whether there is reason to know that the child is an Indian child." *Id.*; *see also H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48, ¶ 5.

---

[2] After the order issued in this case, section 19-1-126(3), C.R.S. 2024, was repealed, *see* Ch. 338, sec. 1, § 19-1-126, 2025 Colo. Sess. Laws 1779-81, and replaced with a more detailed statute, *see id.* at sec. 2, §§ 19-1.2-101 to -132, 2025 Colo. Sess. Laws at 1781-1815. We cite and apply the 2024 statute because that was the version in effect throughout the pendency of this case.

¶ 10     We review a juvenile court's finding of due diligence for an abuse of discretion.  *See H.J.B.*, ¶ 58 (whether a department has satisfied its due diligence obligation is ultimately left to the sound discretion of the juvenile court).

## B.     Additional Facts

¶ 11     In September 2023, father reported that he had "some [Indian] heritage" and that "Apache [was] a potential tribe."  But he stated that he did not have any living relatives who could provide more information about his heritage.  The next day, father filed an ICWA ancestry chart that included the names of his father and grandfather but no contact information for them.

¶ 12     About a month later, the Department filed a sworn statement in which the caseworker detailed her attempts to contact several of father's kin to gather information about his heritage.  The Department also sent ICWA notices to the Bureau of Indian Affairs and nine federally recognized tribes associated with the Apache Nation.

¶ 13     On the first day of the termination hearing, the Department reported that it had received six responses from tribes indicating that neither the child nor father was enrolled or eligible to be

enrolled in that tribe; two certifications indicating that the tribes received the notice but had not responded to it; and no certification or response from the remaining tribe. At that time, neither parent had any new information related to father's heritage or any ICWA issues generally. On the fifth day of the termination hearing, the parties confirmed that they still had no new information related to ICWA.

¶ 14    Thereafter, the juvenile court found that the Department had "exercised due diligence to gather additional information throughout the proceedings that would assist the court in determining whether there [was] reason to know that the child is an Indian child" but that there was no information indicating a reason to know.

## C.    Analysis

¶ 15    Both parents argue that, in relation to father's heritage, the juvenile court abused its discretion by finding that the Department complied with the due diligence provisions of Colorado's ICWA statute, § 19-1-126(3). They assert that the Department failed to exercise due diligence because, although the Department sent ICWA

notices to nine Apache tribes, it didn't follow up with the tribes that didn't send responses.

¶ 16     However, father's mere assertion of Apache heritage didn't trigger ICWA's notice requirements.  *See* 25 U.S.C. § 1912(a) (notice to the child's tribe is required only when a court knows or has reason to know that an Indian child is involved in the proceedings); *E.A.M.*, ¶ 6 (a mere assertion of Indian heritage, even one that names a specific tribe, is not enough to give the juvenile court reason to know that the child is an Indian child).  Rather, it triggered the due diligence requirements under section 19-1-126(3).  And due diligence is a flexible standard that doesn't require a department to exhaust every possible option in attempting to gather information or contact every tribe mentioned by the parent.  *See H.J.B.*, ¶¶ 54, 58.

¶ 17     Although it wasn't necessarily required, the Department contacted the tribes that father mentioned.  That was in addition to the caseworker's attempts to contact several of father's kin despite father's failure to provide any of their names or contact information.  Based on those facts, we perceive no abuse of discretion in the

juvenile court's conclusion that the Department exercised due diligence under section 19-1-126(3).

### III. Termination of Parental Rights

#### A. Legal Framework and Standard of Review

¶ 18    The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent hasn't complied with an appropriate, court-approved treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 19    The question of whether a juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. Thus, we review the court's factual findings for clear error but review de novo its legal conclusions based on those facts. *Id.*

#### B. Mother's Appeal

##### 1. Reasonable Efforts

¶ 20    Mother contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate her because

the Department failed to accommodate her disability. We aren't persuaded.

### a. Applicable Law

¶ 21 To determine whether a parent is unfit, the juvenile court must consider whether the department of human services made reasonable efforts to rehabilitate the parent and reunite the family. *See* §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2025; *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). "Reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2025.

¶ 22 Additionally, the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213, requires public entities to make reasonable accommodations for qualified individuals with disabilities. *See People in Interest of C.Z.*, 2015 COA 87, ¶¶ 11-12. Thus, before terminating parental rights under section 19-3-604(1)(c), the ADA requires the juvenile court to consider whether a department provided reasonable accommodations when determining whether it made reasonable efforts to rehabilitate the parent. *People in Interest of S.K.*, 2019 COA 36, ¶ 34.

¶ 23 As it relates to the ADA, a parent should identify any modifications that they believe are necessary to accommodate the disability. *Id.* at ¶ 21. In considering whether reasonable accommodations can be made for a parent's disability, the juvenile court's paramount concern must be the child's health and safety. *Id.* at ¶ 36. Thus, what constitutes a reasonable accommodation will vary from case to case based on the child's needs, the nature of the parent's disability, and the available resources. *Id.* at ¶ 39.

### b. Additional Facts

¶ 24 In the petition, the Department acknowledged that mother had limited cognitive abilities and an intellectual disability. Mother's initial treatment plan stated that she "may be asked to complete additional psychological testing or updates to better understand her developmental and mental health needs." It also required mother to "explore what services/supports [could] be offered [to] her through the local Community Center Board and . . . engage in any appropriate services that may benefit her."

¶ 25 In March 2024, mother filed a motion for ADA accommodations. She requested that the court order the Department to follow the recommendations from a psychologist who

had completed an adaptive parenting assessment with mother. The record doesn't indicate whether the juvenile court ever ruled on mother's motion or ordered the Department to provide the requested accommodations.

¶ 26 Then, about two months after the Department moved to terminate mother's parental rights, mother filed a motion to modify her treatment plan. By that point, the psychologist had completed an addendum to the adaptive parenting assessment, and mother requested that her treatment plan be modified to include the psychologist's updated recommendations as ADA accommodations.

¶ 27 Noting that the case was already set for a termination hearing, the juvenile court denied mother's motion, stating that "the issues raised in . . . mother's motion [were] most appropriate[ly] addressed within the context of the termination [hearing]."

c. Analysis

¶ 28 Although the juvenile court never ordered the Department to accommodate mother's disability by implementing the psychologist's recommendations, it found that the Department didn't violate the ADA because it "agreed to and implemented" the requested accommodations. It further found that the Department

11

made "tremendous effort to allow mother to choose her own providers [and] to let her take the lead where she could." It also found that mother's life skills worker and family time supervisor "went above and beyond" to accommodate and rehabilitate mother.

¶ 29 The record supports the juvenile court's findings. Specifically, the record shows that the Department provided the four accommodations that mother now claims were lacking: (1) an "easy-to-read" treatment plan that provided her with clear expectations; (2) family time that increased over time in both home and community environments; (3) a robust support network; and (4) the opportunity to self-direct her treatment.

¶ 30 First, the caseworker testified that the professionals on mother's team used a simplified treatment plan, created by mother's counsel, as a tool to help mother understand her treatment plan. Mother's life-skills worker testified that she reviewed the treatment plan with mother every month and provided "vocabulary support" for some of the words in it. She also testified that when working with mother, she used "simplified terms," rephrased "higher level" concepts, and used the "teach-back method" to ensure mother understood what they were talking

about. She stated that mother had a "basic understanding" of the treatment plan and was able to articulate its components.

¶ 31 Second, the family time supervisor testified that when the case opened, mother's level of supervision was "parent coaching supervised," a high level of supervision involving intensive "hands-on" teaching. But as the case progressed and mother's parenting skills improved, the level of supervision was decreased to non-coaching supervised and then to monitored supervision. Mother's regular family time took place in her home, and she was allowed to take the child into the community. Still, about a year and nine months after the case opened, the juvenile court ordered that mother's level of family time supervision be increased from monitored to supervised because mother had allowed "at least two individuals" who posed a safety risk to the child to move into her home, and she had gotten back together with her boyfriend despite the court's order that the child have no contact with him. *See S.K.,* ¶ 34 (ADA accommodations must account for the child's health and safety).

¶ 32 Third, in terms of creating a "robust support system" for mother, the record indicates that the professional teams from both

of mother's cases jointly met with her every month. Further, the Department referred mother to the Hope Initiative, an organization that specializes in providing life skills and parenting education to parents with intellectual disabilities; a life-skills worker from that organization spent four hours per week providing mother with in-home services. Moreover, the life-skills worker testified that, while she wanted to collaborate with mother's local community center board to help mother access more services and become more independent, mother's legal team told her that they didn't want her to be involved with arranging those services. In any event, by the time of termination, mother was working with the community center board, and it was providing her with rent assistance as well as behavioral, personal care, homemaker, and mentorship services.

¶ 33    Fourth, the record shows that the Department focused on allowing mother to have agency over the services she received. The caseworker testified that the Department allowed mother to choose her therapist. The life-skills worker testified that she and mother planned their sessions together and that mother chose the skills on which she wanted to work. The life-skills worker also encouraged mother to advocate for herself and helped mother do so at the

14

monthly team meetings. Further, a case manager from the community center board testified that, after mother qualified for services, she had control over which services she chose to receive.

¶ 34    It's true, as mother argues, that the psychologist opined that the Department hadn't provided reasonable accommodations for mother's intellectual disability. However, the juvenile court specifically found that the psychologist wasn't credible and didn't rely on her testimony or opinion. We can't reweigh the evidence or disturb the court's findings when, as here, they have record support and are based on credibility determinations. *See People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010) (the credibility of the witnesses, as well as the sufficiency, probative effect, and weight of the evidence are all subject to the juvenile court's discretion); *People in Interest of K.L.W.*, 2021 COA 56, ¶ 62 (we do not reweigh the evidence or substitute our judgment for that of the juvenile court).

¶ 35    Based on the foregoing, we discern no error in the court's determination that the Department accommodated mother's disability and made reasonable efforts to rehabilitate her and reunite her with the child.

## 2. Fit Within a Reasonable Time

¶ 36    Mother also contends that the juvenile court erred by finding that she couldn't become fit within a reasonable time. We disagree.

### a. Applicable Law

¶ 37    A parent must have a reasonable amount of time to work on a treatment plan before the juvenile court terminates their parental rights. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007). The determination of a reasonable period is necessarily fact specific, and thus, what constitutes a reasonable time to comply with a treatment plan may vary from case to case. *Id.* In determining whether a parent can become fit in a reasonable time, the juvenile court may consider whether any change has occurred during the pendency of the proceeding. *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006). A reasonable time is not an indefinite time, and it must be determined by considering the physical, mental, and emotional conditions and needs of the child. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.

¶ 38    Additionally, when a child is under six years old, the juvenile court must consider the expedited permanency planning (EPP) provisions, which require that the child be placed in a permanent

home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025.

### b. Analysis

¶ 39 The juvenile court considered whether mother could become fit within a reasonable amount of time but ultimately concluded she couldn't. The court noted that this EPP case had been open for "almost three years" and that the child had been in out-of-home placement for "almost the entire time." The court found that mother hadn't been able to make significant progress in therapy or demonstrate an ability to keep the child safe. The court was also concerned that mother continued to be involved in the criminal justice system. Based on those findings, the court found that it wasn't in the child's best interests to keep the case open any longer.

¶ 40 The record supports these findings. By the time of termination, over two years had passed since the court adopted mother's initial treatment plan, and approximately one year had passed since the Department added the final component to it. But mother still hadn't successfully resolved the Department's concerns.

¶ 41    Mother's therapist testified that although mother was very engaged when she attended therapy, her attendance had been inconsistent. The therapist noted that mother had several "no call no shows" and had attended only three therapy sessions in the prior three months. Similarly, mother's former therapist testified that mother was discharged from therapy after cancelling and rescheduling (but not attending) her therapy appointments for "a couple of months."

¶ 42    The caseworker testified that throughout the case, mother demonstrated a pattern of poor decision-making "around relationships and th[e] people that she [brought] around her children and into her home." Indeed, despite the juvenile court's order for the child to have no contact with mother's ex-boyfriend, mother had allowed him to move in with her and requested that he be part of her family time. Then, after the termination hearing had already started, mother was charged with domestic violence and harassment for sending the same ex-boyfriend threatening messages. Based on those patterns, the caseworker said she didn't believe that mother would be able to mitigate the Department's

concerns about her protective capacities in a reasonable amount of time.

¶ 43    Further, the caseworker testified that the case had been "open for a very long time" and opined, as an expert in social casework with an emphasis in child protection, that mother had been "given multiple opportunities and [an] ample amount of time" to comply with her treatment plan.  The caseworker also opined that it was in the child's best interests to terminate mother's rights because the child was young and vulnerable and needed the security of a stable and safe household.

¶ 44    Based on the foregoing, we conclude that the juvenile court properly analyzed whether mother could become fit within a reasonable time.  And because the court's findings are supported by the record, we decline to disturb its determination.

### C.    Father's Appeal

#### 1.    Treatment Plan

¶ 45    Father first contends that the juvenile court erred by finding that his treatment plan was appropriate.  We discern no basis for reversal.

## a. Applicable Law

¶ 46 An appropriate treatment plan is one that relates to the child's needs and is reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time. § 19-1-103(12). The appropriateness of a treatment plan must be assessed in light of the facts existing at the time of the plan's approval. *People in Interest of A.N-B.*, 2019 COA 46, ¶¶ 25-26. In determining whether a treatment plan is appropriate, the court must consider whether the plan's objectives adequately address the safety concerns that led to the filing of the petition. *People in Interest of K.B.*, 2016 COA 21, ¶ 14. The fact that a treatment plan is ultimately unsuccessful doesn't mean that it was inappropriate. *Id.*

## b. Analysis

¶ 47 Father asserts that his treatment plan was inappropriate because he didn't have the ability to comply with it. Specifically, he argues that he couldn't engage in family time because of his incarceration and technical issues with his facility's video software, and that he couldn't engage in sex offender treatment because his facility didn't offer it. Thus, he asserts, both the family time and

sex offender treatment objectives of his treatment plan were inappropriate. We disagree.

¶ 48    At the time the juvenile court adopted father's treatment plan, father had been convicted of a sex crime involving a child and was serving a twenty-year prison sentence in Oklahoma. Father had never met or had any contact with the child. Thus, the treatment plan addressed the Department's concerns at the time it was adopted — concerns about his ability to parent the child in light of his conviction and concerns about his lack of a relationship with the child. *See A.N-B.*, ¶¶ 25-26; *K.B.*, ¶ 14. When the juvenile court adopted the treatment plan, neither the Department nor the court could have predicted that father's facility would be unable to provide family time over video or wouldn't provide any sex offender treatment.

¶ 49    To the extent father argues that his treatment plan became inappropriate and that the Department should have modified it after learning about the video software issues and the lack of sex offender treatment, we conclude that he failed to preserve this argument. Although father argued that the Department failed to provide him with the services necessary to comply with his

treatment plan, he never moved the juvenile court to modify his treatment plan. Nor did he argue at the termination hearing that his treatment plan should have been modified at some point during the proceedings. Thus, we decline to address this argument on appeal. *See People in Interest of K.L-P.*, 148 P.3d 402, 403 (Colo. App. 2006) (arguments never presented to, considered by, or ruled upon by a juvenile court may not be raised for the first time on appeal).

## 2.    Reasonable Efforts

¶ 50    Next, father argues that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate him and reunite him with the child. We conclude that any error was harmless.

### a.    Applicable Law

¶ 51    As noted above, a department of human services must make reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h). The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *S.N-V.*, 300 P.3d at 915, by "considering the totality of the circumstances and

22

accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

¶ 52 A parent's incarceration doesn't excuse a department from making reasonable efforts. *See* § 19-3-508(1)(e), C.R.S. 2025. When a department learns of a parent's incarceration, it must communicate with the facility where the parent is held regarding the requirements of the parent's treatment plan and provide information to the court detailing the services and treatment available to the parent at that facility. § 19-3-508(1)(e)(I)-(III). If the caseworker is unable to determine any treatment or services available to the parent, they must still report their efforts to obtain such information. § 19-3-508(1)(e)(III).

b.     Analysis

¶ 53 The juvenile court found that the Department made reasonable efforts to rehabilitate father. Specifically, it found that the Department "did what [it] could" but that it was "extremely difficult" to work with father's facility. But father asserts that the court's reasonable efforts finding was erroneous because (1) the Department failed to provide any family time; (2) the second

caseworker failed to communicate with the facility to arrange treatment services; and (3) the second caseworker failed to regularly communicate with him.

¶ 54    It's undisputed that father never had any family time with the child.  And we agree that the record doesn't show that the second caseworker made significant efforts to communicate with father or his facility.  To be sure, that caseworker testified that in the year he worked on the case, he sent only one introductory email to the facility's case manager and spoke to father during two administrative reviews of the case.

¶ 55    Nonetheless, the record indicates, and father testified, that the first caseworker maintained ongoing contact with him and sent him monthly updates and photos of the child.  The record also shows that the first caseworker had extensive and ongoing conversations with the case manager at father's facility.  That caseworker made two family time referrals, one of which remained open at the time of termination.  And the Department transported the child to the library on several occasions to participate in virtual family time, but the video software at father's facility didn't work.

¶ 56     The second caseworker testified that, although he did not speak with the case manager at father's facility, he learned during an administrative review of the case that "there wasn't a whole lot of programming available" at father's facility. The second caseworker also testified that father told him the issues with the video software hadn't been resolved. The second caseworker further testified that he asked the Department's service navigator if the Department could provide father any virtual treatment, but the navigator told him that wasn't possible.

¶ 57     Moreover, nothing in the record suggests that, if the second caseworker had contacted father or the facility more regularly, it would have made a difference in the outcome of the case. This is especially true given father's testimony on the last day of the termination hearing, that the video software still hadn't been fixed and there was still no sex offender treatment available to him. Thus, even if the second caseworker's efforts were lacking, any error in the court's determination that the Department made reasonable efforts to rehabilitate father was harmless. *See* C.A.R. 35(c); C.R.C.P. 61; *People in Interest of M.H-K.*, 2018 COA 178, ¶ 21 (an error is harmless if it can be said with fair assurance that it did not

substantially influence the outcome of the case or impair the basic fairness of the trial itself).

### 3. Finding of Unfitness

¶ 58 Father next contends that the juvenile court erred by finding that he was unfit. He asserts that the finding was improperly based on his incarceration and that he was fit because he had complied with his treatment plan. We aren't persuaded.

### a. Applicable Law

¶ 59 A parent is unfit if their conduct or condition renders them unable or unwilling to give a child reasonable parental care. *S.R.N.J-S.*, ¶ 9. "Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs." *Id.* In determining a parent's unfitness, a juvenile court may consider, among other factors, the length of the child's foster care placement. § 19-3-604(2)(k).

¶ 60 Parental incarceration *alone* is an insufficient basis on which to terminate parental rights. *K.D.*, 139 P.3d at 700. But the juvenile court "may, and in some cases must, consider parental incarceration in determining fitness." *Id.* at 701.

26

## b.  Analysis

¶ 61     As a threshold matter, we reject father's argument that the juvenile court was prohibited from considering his incarceration in determining unfitness because the legislature repealed the subsection of 19-3-604 that allowed termination of a parent's rights based solely on extended incarceration.  *See* Ch. 191, sec. 7, § 19-3-604, 2023 Colo. Sess. Laws 957 (repealing former section 19-3-604(1)(b)(III)).  S.B. 23-039's legislative declaration states, in relevant part, that "decisions to terminate parental rights should be based on the needs of the child, and not *solely* on the status of the parent as incarcerated or the length of the sentence."  2023 Colo. Sess. Laws at 953 (emphasis added).  Thus, S.B. 23-039 doesn't contradict the supreme court's holding in *K.D.* — that a juvenile court may not base termination *solely* on a parent's incarceration, but it may consider incarceration as one factor in determining whether a parent is fit.  *See K.D.*, 139 P.3d at 700.

¶ 62     In determining that father was unfit, the court stated that the length of father's sentence and the nature of his conviction — a sex offense involving a child — contributed to its finding.  To that end, the juvenile court found that father was unfit because he wouldn't

27

be available to parent the child "for a very long time," and, even if he was released from prison, he would still need to do "a great deal of treatment" to become a fit parent. The court found that the "main treatment" necessary for father to become fit was sex offender treatment, which wasn't available to him at his prison facility. Moreover, the court found that father didn't have a relationship with the child or the ability to build one. Ultimately, noting that the child had been in out-of-home placement for the entire case, the court concluded that father couldn't become fit within a timeframe that was reasonable to meet the child's needs.

¶ 63 The record supports those findings. It shows that father had been convicted of a sex crime involving a child and was serving a twenty-year prison sentence. Indeed, father testified that he believed that he wouldn't be released from prison until 2039. Further, the caseworker opined that father would, at a minimum, need to be enrolled in sex offender treatment before the Department could appropriately assess whether he could be a safe parent. And father confirmed that his facility didn't offer sex offender treatment or allow out-of-state agencies to provide such treatment.

¶ 64    True, the caseworker admitted that father had no control over the technical issues with the facility's video software, and thus, had no control over whether he could participate in family time and develop a relationship with the child. Even so, father admitted that the Department also had no control over those issues and that his facility wouldn't allow him to use any other video software for family time. The caseworker opined that termination was in the child's best interests because, as a result of father's lack of relationship with the child, he didn't understand the child's needs. And, because of the length of father's sentence, the caseworker opined that father couldn't meet the child's needs for the "foreseeable future."

¶ 65    We reject father's argument that the juvenile court erred by finding he was unfit even though he complied with his treatment plan to the best of his abilities. The court acknowledged that father "participated as much as [he] could." But partial or even substantial compliance may not be sufficient to render a parent fit. *K.B.*, ¶ 26. The juvenile court found, with record support, that father's compliance didn't render him fit.

¶ 66    Based on the foregoing, we conclude that, although father's incarceration informed the juvenile court's decision, it wasn't the sole reason that the court found him unfit.  *See K.D.*, 139 P.3d at 703 (the court did not err when it "carefully considered how [the parent's] continued incarceration affected his fitness and his corresponding ability to meet [the child's] needs within a reasonable time").  And because the record supports the court's unfitness finding, we won't disturb it.

### 4.    Less Drastic Alternatives

¶ 67    Last, father contends that the juvenile court erred by determining that there were no less drastic alternatives to termination.  We disagree.

### a.    Applicable Law

¶ 68    The consideration and elimination of less drastic alternatives are implicit in the statutory criteria for termination.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40.  In considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29.

¶ 69    For a less drastic alternative to be viable, it must do more than adequately meet the child's needs; it must be in the child's best interests. *A.M.*, ¶ 27. Long-term or permanent placement with a family member, short of termination, may not be in the child's best interests if it doesn't provide the permanence that adoption would provide or otherwise meet the child's needs. *People in Interest of A.R.*, 2012 COA 195M, ¶ 41. If a juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the alternative and order termination. *A.M.*, ¶ 32.

### b.    Analysis

¶ 70    Father argues that an allocation of parental responsibilities (APR) to mother was a less drastic alternative to termination. But father's argument is essentially a challenge to the court's findings that mother was unfit and unlikely to change within a reasonable time. To be sure, the majority of father's argument is about the Department's alleged failure to accommodate mother's intellectual disability and make reasonable efforts to rehabilitate her. However, father lacks standing to challenge the propriety of the juvenile court's termination of mother's parental rights. *See People in*

31

*Interest of J.A.S.*, 160 P.3d 257, 261 (Colo. App. 2007). And, as discussed in Part III.B, we reject those challenges advanced by mother.

¶ 71    To the extent father has standing to challenge the juvenile court's rejection of an APR to mother as a less drastic alternative to termination, we discern no basis for reversal. The court found that mother was unfit based on her inability to protect the child, her lack of progress in mental health therapy, her recent and ongoing involvement in the criminal justice system, and the child's need for permanency. Because the record supports the court's finding that mother was an unfit parent, it necessarily follows that an APR to mother wasn't viable as a less drastic alternative.

¶ 72    Finally, we decline to address father's argument that the Department failed to investigate whether placement with any of his relatives could be a less drastic alternative to termination because father raises this argument for the first time on appeal. *See K.L-P.*, 148 P.3d at 403.

¶ 73    Accordingly, because the record supports the juvenile court's finding that there were no less drastic alternatives to termination, we discern no basis for reversal. *See People in Interest of B.H.*, 2021

CO 39, ¶ 80 (when a juvenile court considers less drastic alternatives but instead finds that termination is in the child's best interests, we are bound to affirm the decision so long as the record supports its findings).

## IV. Disposition

¶ 74    The judgment is affirmed.

JUDGE TOW and JUDGE LIPINSKY concur.